Argued and submitted November 3, 1982, affirmed April 13, reconsideration denied
June 10, petition for review allowed September 7, 1983 (295 Or 617)
See 297 Or 341, 685 P2d 988 (1984)

MULTNOMAH COUNTY,
*Respondent*,

*v.*

UNION PACIFIC RAILROAD COMPANY,
*Appellant.*

(A8008-04391; A23658)

662 P2d 339

Jeff S. Asay, Portland, argued the cause for appellant. With him on the briefs were L. James Bergmann, Randall B. Kester and John F. Weisser, Portland.

Denise Francis, Assistant County Counsel, Portland, argued the cause for respondent. With her on the brief was John B. Leahy, County Counsel, Portland.

Before Joseph, Chief Judge, and Van Hoomissen and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

Defendant (railroad) appeals a judgment declaring that Multnomah County (county) has a prescriptive easement for a public pedestrian grade crossing over the railroad right-of-way and enjoining the railroad from obstructing public use of the crossing. The railroad argues: (1) the county has no legal authority to acquire a public crossing over a railroad track by prescriptive easement; (2) in the absence of an order from the Public Utility Commission (PUC) establishing the crossing as a public one, the county is not entitled to an injunction; and (3) the county did not establish adverse user in its capacity as a county. We review *de novo* and affirm.

### FACTUAL BACKGROUND

The crossing lies between Columbia Boulevard on the north and Lombard Street (or Portland Highway) on the south. The railroad purchased the strip of land from John Zwahlen in 1910 for its right-of-way for tracks in that area. The deed reserved to Zwahlen "one private crossing at grade at the east end of the above granted strip."

Residents in the area have viewed the crossing as public and have used it as a pedestrian crossing since at least 1915. At that time, the crossing consisted of a path and wagon tracks and was used by residents in the area to get to Columbia Boulevard, which was the only public road at that time. A witness for the county stated that she had used the crossing since 1919 and that she and her family had continued to use it throughout the 1950's and 1960's when her children attended Whittaker School, just north of Columbia Boulevard. The crossing has been used by residents in the area since 1948 for the purposes of going to school and recreation. Approximately 160 to 280 school children have used the crossing on school days.

In 1937, the surrounding area was subdivided, and N.E. 52nd Avenue between Lombard Street and Columbia Boulevard, exclusive of the railroad tracks, was dedicated as a public road. The dedication has never been accepted by the county, and that portion of N.E. 52nd Avenue has never been declared a county road, so the county has not spent funds on maintenance of the road surface, in

accordance with the statutory limitation on use of county road funds. *See* ORS 368.705.

The county has, however, made efforts with respect to use of the crossing by pedestrians. In particular, it has exercised a role related to the safety of school children using the crossing. The county entered into an agreement with the state for the state to install and the county to maintain a traffic signal at N.E. 52nd and Lombard. The agreement was made because of concern about the safety of the school children who were using 52nd Avenue and the railroad crossing as their route to and from Whittaker School. The county installed stop signs on both sides of the railroad tracks in 1973 and also installed traffic signals at the other end of 52nd Avenue at Columbia. Additionally, the county expended money to construct 112 feet of sidewalks for pedestrians to proceed to and from the railroad crossing on 52nd Avenue. Plans for additional sidewalks along 52nd Avenue were postponed by the Board of County Commissioners when the railroad closed the crossing to pedestrian use.

Although never accepted as a county road, N.E. 52nd Avenue was nonetheless used by automobiles until 1976, when the road was closed to vehicles on a recommendation by the Board of County Commissioners and at the request of the PUC. The crossing was closed to automobile traffic with the understanding by the PUC, the county and the railroad that an eight to ten-foot wide portion of the crossing would remain open to pedestrians. The railroad put in planking for use by pedestrians, and the crossing continued to be used by pedestrians.

In 1978, the railroad constructed an additional track at the crossing. Shortly thereafter, neighborhood residents began to complain to the PUC that the railroad had parked cars on the side track and blocked the pedestrian crossing. The PUC cited the railroad for blocking a public crossing approximately 35 times from April, 1979, to May 6, 1980. The Attorney General filed suit, seeking fines against the railroad of from $3,000 to $10,000 for each of the 35 citations. In lieu of litigating the blocking citations, the PUC and the railroad entered into a settlement agreement under which the railroad would pay the PUC $15,000

in settlement of the fine claims, $13,000 of which would be refunded if the crossing were declared by the court to be a private crossing or should a pedestrian overpass be built.

Despite the citations and the settlement, the problems with blocking continued. The railroad considered several solutions: use of signs; construction of a pedestrian overpass; treating the crossing as private and closing it. When its legal department advised management that it was not certain that the crossing was a public crossing, because there was no PUC order to that effect, the railroad decided to treat it as private and close it. The railroad fenced off the crossing in May, 1980.

The first time the PUC was apprised of the railroad's assertion that the crossing was not a public crossing was in early 1980, at about the time of the settlement agreement. The crossing had long been designated a public crossing by the PUC and listed as such in its log book since 1954. The railroad had assumed that there was a PUC order supporting that designation. Reports submitted by the railroad to the PUC regarding accidents at the crossing in 1970 and 1972 indicate that it was regarded as a public crossing by the railroad. Internal memoranda between railroad officials in the fall of 1978 refer to the crossing as public. There is no evidence that between 1915 and 1980, the railroad ever objected to public use of the crossing.

The sketch following the opinion will be helpful in understanding the physical situation and monuments as they actually exist on the ground.

## COUNTY'S LEGAL AUTHORITY

While Oregon has determined that the public may acquire prescriptive easements for pedestrian travel on private property, *State ex rel Thornton v. Hay,* 254 Or 584, 462 P2d 671 (1969), the specific issue whether a public body may make such an acquisition against a railroad has not been decided.

The railroad argues that former ORS 368.290[1] provided that counties may acquire railroad crossings only by negotiation or condemnation:

---

[1] This action was filed before ORS 368.290 was amended by Or Laws 1981, ch 153, § 65, and recodified as ORS 368.116. The revisions do not materially change the law.

"(1) Whenever in the location, relocation, construction or betterment of any highway within the state, it is deemed necessary to locate, relocate or construct the highway, or any part thereof, upon the right of way of any railroad company, any county in which the highway or proposed highway is or is to be located, relocated or constructed may negotiate and agree with the railroad company for the right to use or occupy the right of way, or so much thereof as is necessary for highway purposes.

"(2) In case no satisfactory agreement can be effected, then the county court of any county through which the road or proposed road passes may acquire the right of way by exercise of the power of eminent domain, and for that purpose may commence and prosecute condemnation proceedings to acquire the right to the use and occupancy of sufficient of the railroad right of way for highway purposes.

"(3) Nothing in this section authorizes the use or occupancy of the railroad right of way which would interfere with the operation of the railroad or its necessary appurtenances, taking into consideration the use of the railroad right of way by the company for yards, terminals, station grounds and necessary additional trackage, or which would jeopardize the safety of the public."

The county relies on former ORS 368.405(2), which provided:

"This section does not preclude acquiring public ways by adverse user."[2]

■ Assuming that both statutes apply to pedestrian ways as well as to roads for vehicular traffic, we conclude that former ORS 368.290 is not exclusive and does not preclude acquisition by adverse user, *i.e.,* prescription, *see* 10 McQuillin, Municipal Corporations §§ 30.22-30.23 (3d ed rev 1981), of a public easement for a crossing over a railroad right-of-way. ORS 368.405(2) recognizes that public ways may be acquired by adverse user. Neither ORS 368.290 nor any other statute cited to us precludes such *acquisition* of easements over railroad rights-of-way. ORS 368.290 applies by its terms only to location, relocation,

---

[2] This action was filed before ORS 368.405 was repealed and replaced by ORS 368.096. Or Laws 1981, ch 153, §§ 14, 79. The revisions do not materially change the law.

construction or betterment of highways on railroad rights-of-way. The county in this proceeding seeks only judicial recognition of an acquired right over an existing way that is already located and constructed. Further, the language of ORS 368.290(1) and (2) is permissive, not mandatory, and does not expressly or impliedly make negotiation and condemnation the exclusive means to acquire public interest in railroad rights-of-way.

## THE EFFECT OF NO PUC ORDER

The railroad next argues that, absent a PUC order establishing the crossing as public, *see* ORS 763.020(1), the county is not entitled to an injunction. The record contains no such order, although the PUC has listed the crossing as public since 1954. ORS 763.020(1) provides:

> "Except for the repair of lawfully existing roads and highways or the replacement of tracks, no highway shall be constructed across the track of any railroad company at grade, nor shall the track of any railroad company be constructed across a highway at grade, without having first secured the permission of the commissioner."

■ Again, we conclude that the statute which limits *construction* of roads and highways[3] over and across an existing railroad is inapplicable to this case. It does not limit acquisition of a public easement and does not apply to an existing crossing. It may be that the county would need such an order if it sought to change the size, character or use of the existing crossing, but that is not an issue here. The injunction was not improper for lack of a PUC order.

## PROOF OF ADVERSE USER

■ Finally, we direct our attention to the question whether the county has established, by clear and convincing proof, all of the required elements necessary to create a public crossing by prescriptive easement. *Thompson v. Scott*, 270 Or 542, 546-47, 528 P2d 509 (1974). We find that on this record there is such proof; *i.e.,* that the public made use of the crossing under a claim of right and that the use was open, notorious, adverse and continuous for more than ten years.

---

[3] "Construction" in ORS 763.020(1) appears to mean the laying out *and* the extension of a highway. *See* ORS 763.020(2).

While the railroad concedes that "[s]ome members of the public may have used the crossing openly for the statutory period * * *," it argues that the county cannot rely on the public use to make its case. The railroad asserts that the focus must be on the *county's* use, and argues that there is no proof that the county, *"in its capacity as county,"* has made any actual use of this crossing.

■ The establishment of this easement does not depend on what the county itself physically did or did not do on the ground at the site of the crossing. It necessarily follows from the rule that the public may acquire property by adverse use that the public must be able to protect and enforce those rights. That is where the county comes in. As the organized representative of the public, the county has the capacity to hold and convey public lands, *see* ORS chapter 275, and has authority over public roads and ways. *See* ORS chapter 368. In that role, the county holds whatever property interests its constituents have as members of "the public." *Cf.* 10 McQuillin, *supra,* § 30.36 (municipal corporations hold title to public ways in trust for public use). If the public interest in property is acquired by public user, the county is deemed to hold the same interest, because it holds and protects the public's interest. It is a proper body to seek judicial recognition and protection of the easement.

■ In light of this underlying principle, we also reject the railroad's assertion that the county's failure physically to maintain the crossing is a crucial fact in this case. Although, arguably, mere use by the public, standing alone, may not establish a prescriptive easement, we know of no rule providing that "maintenance" is an essential element in the acquisition of such an easement. Here, the county was prohibited from using county road funds to maintain the crossing itself, because the county had not accepted the crossing as part of a county road. However, the county did expend funds for safety measures near the crossing and for sidewalks leading up to it. It exerted its supervisory authority in conjunction with the PUC to direct the railroad to close the crossing to vehicles and to improve the crossing for pedestrian use, and the railroad acceded to those directives. That the railroad also expended funds for those purposes does not negate the county's claim.

■ ■ The railroad's remaining contention is that, even if the evidence establishes that the crossing was used by members of the public for longer than ten years, that use can never ripen into a vested property right, because from the beginning it was a permissive use. In our *de novo* review, we do not find any support for such a contention. At the beginning, the only "permitted" use was Zwahlen's. As early as 1915, and consistently thereafter, the crossing was assumed by both parties to be subject to public use. In fact, it was not until 1980, shortly before the railroad constructed a fence across the crossing, that the evidence points to any conduct on the part of the railroad indicating a contrary attitude. Mere acquiescence to an adverse use is not permission. *See Feldman et ux v. Knapp et ux,* 196 Or 453, 472, 250 P2d 92 (1952).

We conclude that the public has a prescriptive easement for a pedestrian crossing over the railroad right-of-way and that the county is the proper representative of the public interest in that easement.

Affirmed.