Argued and submitted November 1, 1983, reversed and
remanded with directions July 3, 1984

# MULTNOMAH COUNTY,

*Respondent on Review,*

*v.*

# UNION PACIFIC RAILROAD COMPANY,

*Petitioner on Review.*

(TC A8008-04391; CA A23658; SC 29617)

685 P2d 988

Denise Francis, Assistant County Counsel, Multnomah County, Portland, argued the cause and filed response for Respondent on Review. With her on the brief was John B. Leahy, County Counsel.

Jeff S. Asay, Portland, argued the cause and filed petition for Petitioner on Review. With him on the petition were L. James Bergmann, Randall B. Kester and John F. Weisser, Portland.

LINDE, J.

## LINDE, J.

Multnomah County sued the Union Pacific Railroad Company ("Railroad") to prevent the Railroad from closing an existing pedestrian walkway across its tracks. The dispute involves issues concerning the concept of a public easement and the relationship of this concept to the Public Utility Commissioner's regulatory responsibility for railroad crossings.

The history leading to this litigation, with a sketch of the disputed crossing, is set out in the opinion of the Court of Appeals, 62 Or App 633, 662 P2d 339 (1983), and is only summarized here.

The Railroad's tracks at the disputed crossing lie between Columbia Boulevard and Lombard Street in Multnomah County. When the Railroad acquired the right of way in 1910, the deed reserved to the seller a private crossing at grade level. Local residents have used the crossing at least since 1915, when it was a path and wagon tracks, in order to get to Columbia Boulevard, which then was the only public road. In modern times it has been used by school children to go to and from school.

When the area was subdivided in 1937, a street at right angles to and abutting but not including the Railroad's right of way designated as N.E. 52nd Avenue was dedicated as a public road, but the dedication was not accepted by the county and no county funds were spent to maintain the street. The county did, however, spend some money on pedestrian sidewalks, traffic signals, and stop signs near the railroad crossing.

In 1976 the county initiated a recommendation that led the Railroad to close the crossing to vehicles but reserve a pedestrian walkway across the tracks, for which the Railroad installed planking. In 1978, the Railroad constructed a second track on which it often parked railroad cars that blocked the pedestrian crossing. In response to complaints the Public Utility Commissioner (hereafter PUC) repeatedly cited the Railroad for blocking a public crossing contrary to then OAR 860-42-091. A suit to collect fines for 35 such citations was settled in 1980 by an agreement under which the Railroad would pay $15,000, $13,000 of which would be refunded if a

court were to declare the crossing to be private rather than public or if a pedestrian overpass were built to replace the grade crossing. The Railroad's legal department then took the position that the pedestrian walkway was not properly a public crossing in the absence of a PUC order to that effect, and the Railroad fenced off the crossing in May 1980.

The county brought the present suit in July 1980. It alleged that for more than ten years before the placement of the fences, "the people of Multnomah County have enjoyed a right of pedestrian crossing" across the railroad tracks at the specified site, that many children regularly use the crossing to go to school and recreational facilities, and that "[a]s a result of this right of way having been used under a claim of right openly, visibly, notoriously and adversely to Defendant" for more than ten years without interruption, "Multnomah County has acquired an easement by prescription to the use of the crossing * * * as a public right of way * * *." The county further alleged the Railroad's construction of the sidetrack and of the fences obstructing the pedestrian crossing, with consequent irreparable injury to "the people of Multnomah County * * *." The complaint asked the court to declare that the county has an easement for a pedestrian right of way at the site and to enjoin the Railroad from interfering with or obstructing "the use of the easement by the people of Multnomah County * * *." The Railroad defended on the grounds that the PUC had not approved a public crossing, that counties have no authority to establish roadways across railroad tracks by prescription or adverse possession, and that the county had not made out all elements needed for a prescriptive easement. After a trial, the circuit court ordered the relief requested by the county.

On appeal, the Court of Appeals rejected the Railroad's legal objections to the creation of a public crossing by prescription and without a PUC order. The court then agreed with the circuit court's finding that the evidence established a prescriptive easement and affirmed the injunction granted by the circuit court. We allowed review to examine the relationship between the issues litigated in the circuit court and the statutory responsibilities of the PUC. For the reasons stated below, we conclude that the county's suit should have been dismissed.

## I. APPLICATION OF ORS 763.020(1).

■ The central problem in this case arises from the intersection, not only between a railroad and an alleged public roadway, but between the state's regulation of the former and the county's responsibility for the latter. If the Railroad is right that a public crossing at the disputed site requires the approval of the PUC, the existence of a public easement that was tried in the circuit court is at most secondary in deciding the final outcome. In short, the case presents a classic issue whether primary jurisdiction is in the agency or the court. Yet we do not have the PUC's views on the issue. The PUC neither decided for or against a public crossing nor appeared in this action. Instead, the case was channeled into the circuit court as a result of the settlement negotiated by counsel for the PUC, which conditioned return of the fines for blocking the crossing on a decision to be obtained in a court. This apparently was on the assumption that the circuit court could determine whether or not the crossing was "public" for purposes of the PUC's regulatory responsibilities and that a "public easement" over land ipso facto would be a public crossing over a railroad line.[1]

■ If that was the assumption, it was not well founded. An easement over a railroad's land is not the same as permission to maintain a grade crossing over an operational railroad

---

[1] On July 11, 1980, the commissioner wrote to Cathy Douthit, one of the interested citizens, in part:

"On June 25, Dave Astle of my staff and Paul Graham of the Attorney General's Office met with John Leahy, Multnomah County Counsel. Dave expressed our feeling that Multnomah County is the proper agency to pursue the public vs. private issue at the crossing on behalf of its residents . . . .

"If the crossing is determined to be public, we will make every effort to assure that the public safety and public access concerns which you express are resolved in a satisfactory manner."

The Railroad raised the issue of the PUC's responsibility to approve public crossings by its motion to dismiss. When a court which properly has jurisdiction over one aspect of a case (here the question whether the county could show a public right to use the railroad's real property) concludes that an agency has primary jurisdiction over another aspect of the case (here compliance with ORS 763.020), it may sometimes be appropriate to dismiss the action as premature and sometimes to retain jurisdiction pending the agency's decision. See 4 Davis, Administrative Law Treatise § 22:1 (2d ed 1983). In this case dismissal was required for the reasons stated in Part II. Perhaps, in the context of the settlement negotiations, the litigation was intended for purposes of allocating the costs of an overpass, see ORS 763.280, but the record does not show this, and it would not affect the PUC's responsibility under ORS 763.020.

line, assuming that the PUC's permission is required. Indeed, if the PUC or another agency issued an order within its regulatory authority that required the addressee to provide a public crossing, the presence or absence of an easement might well be immaterial. Such a requirement would last only as long as the order imposing it, independent of any property interest. A true easement, in turn, might exist even if public regulation limits or forbids its use while the regulated operations continue and might again be used when those operations are changed or abandoned. Neither is necessarily dependent on the other.

The Railroad contends that a PUC order for the crossing is required by ORS 763.020(1), which provides:

> "Except for the repair of lawfully existing roads and highways or the replacement of tracks, no highway shall be constructed across the track of any railroad company at grade, nor shall the track of any railroad company be constructed across a highway at grade, without having first secured the permission of the commissioner."[2]

The predecessor of this section dates from 1917. A claim that public use prior to 1917, of any duration, had made the original private crossing a "lawfully existing road or highway" at that time would have to be presented to the PUC, if PUC permission became an issue.[3]

The county makes two arguments against the application of ORS 763.020(1). It argues that the purpose of the statute is to control only vehicular traffic hazards, and

---

[2] The section continues:

"(2) Whenever any railroad company desires to cross any established and existing highway at grade or any public authority desires to lay out and extend any highway over and across any established and existing railroad at grade, it shall file with the commissioner its application setting forth the objections and difficulties of making such crossing either above or below the grade of the existing highway or railroad.

"(3) Upon receipt of the above application the commissioner, after hearing, unless a hearing is not required under ORS 763.080, shall:

"(a) Determine whether the public safety, public convenience and general welfare require a grade separation; and

"(b) In the event a grade separation is not required, determine whether the application should be refused or granted, and upon what terms and conditions."

[3] *Compare Forman v. Clatsop County,* 297 Or 129, 681 P2d 786 (1984), which also involved an effort to use circuit court proceedings to establish binding factual legal conclusions for an administrative decision, there a land use decision.

that the terms "roads" or "highways" do not include a pedestrian walkway. Also, the county notes that the PUC and the Railroad as well as the public and the county long had assumed that there was a legal public crossing between the two ends of N.E. 52nd Avenue. The Court of Appeals did not adopt either of these theories. It held that the statute forbade only construction of a crossing, not the acquisition and use of an easement for a crossing without any construction. We find none of these theories convincing.

ORS 763.020(1) was designed to deal with the dangers of grade crossings. There is no reason to believe that the legislature saw those dangers solely in vehicular traffic. ORS 763.010(1) defines "highway" to include "all roads, streets, alleys, avenues, boulevards, parkways and other places in this state actually open and in use, or to be opened and used for travel by the public." A public crossing limited to pedestrian use involves comparable risks along with the costs and delays of safety precautions required to minimize them. So would a public crossing designed to allow herds of cattle or sheep to be driven across the track. Surely it cannot be held that a new railroad track would need a PUC order to cross a conventional street but not to cross a busy pedestrian shopping mall or parkway that is closed to vehicles. The word "highway" in this statute does not exclude such pedestrian thoroughfares. Moreover, it was only in 1976 that the county requested closure of the crossing to vehicles.

There well may be many pedestrian ways across lightly used railroad tracks in locations where the PUC would approve a grade crossing with modest safety precautions. That is for the commissioner to decide. The present point is only that pedestrian crossings are not beyond PUC jurisdiction. The policy statement of the statute, ORS 763.013, as well as ORS 763.020, expressly makes the PUC, not the counties or the circuit courts, responsible for deciding where grade crossings can safely accommodate both the needs and convenience of local traffic and the needs of an efficient railroad system.[4]

---

[4] ORS 763.013:

"It is the policy of this state to achieve uniform and coordinated regulation of railroad-highway crossings and to eliminate crossings at grade wherever possible. To these ends, authority to control and regulate the construction, alteration, and protection of railroad-highway crossings is vested exclusively in the state, and in the Public Utility Commissioner as provided in this chapter."

■ The same express legislative policy also points to a different significance of the word "construction" from that given it by the Court of Appeals. As the Railroad notes, this court has contrasted "construction" with merely planning or laying out an eventual crossing: "[The statute] refers to the construction and not to the laying out of a highway across the track of a railroad at grade." *Butcher v. Flagg*, 185 Or 471, 475, 203 P2d 651 (1949). The inauguration of an actual public crossing, not the fact that construction work is done on it, gives rise to the concerns that the statute places within the responsibility of the PUC.

■ The county points out that the Railroad and the PUC as well as local residents assumed the crossing to be public until the Railroad's lawyers found that there was no PUC order to that effect, but it is not clear what legal significance the county claims for this fact. Surely the statute does not allow a railroad to oust the PUC's authority by laying a track across a highway, or by allowing a roadway to be run across its tracks, and treating this as an existing public crossing, by mistake or otherwise.

■ ■ As for the PUC's assumptions, its log of public crossings had shown such a crossing at N.E. 52nd Avenue at least since 1954. But the assistant commissioner for the rail program testified that this log entry probably indicated no more than a physical inspection by a member of the PUC staff. An employee's notation observing the existence of a crossing used by the public is not the exercise of the PUC's responsibility for approving grade crossings, for which the statute requires an order. The county makes no legal argument to the contrary beyond stating that it would be "ridiculous" to expect it to seek such an order for a crossing that everyone concerned had long treated as public. Nonetheless, once the railroad changed its assumptions and challenged the designation in the log, the PUC had the statutory responsibility to determine the issue, not a circuit court.

## II. APPLICATION OF FORMER ORS 368.290.

We turn to the issue whether the county acquired a prescriptive easement across the Railroad's land, as distinguished from the PUC's responsibility for approving or disapproving it as a public crossing.

The Railroad relies on former ORS 368.290 (replaced in 1981 by ORS 368.116) as specifying the only procedures by which a county may acquire the right to use a railroad's right of way for highway purposes. The statute provided:

"(1) Whenever in the location, relocation, construction or betterment of any highway within the state, it is deemed necessary to locate, relocate or construct the highway, or any part thereof, upon the right of way of any railroad company, any county in which the highway or proposed highway is or is to be located, relocated or constructed may negotiate and agree with the railroad company for the right to use or occupy the right of way, or so much thereof as is necessary for highway purposes.

"(2) In case no satisfactory agreement can be effected, then the county court of any county through which the road or proposed road passes may acquire the right of way by exercise of the power of eminent domain, and for that purpose may commence and prosecute condemnation proceedings to acquire the right to the use and occupancy of sufficient of the railroad right of way for highway purposes.

"(3) Nothing in this section authorizes the use or occupancy of the railroad right of way which would interfere with the operation of the railroad or its necessary appurtenances, taking into consideration the use of the railroad right of way by the company for yards, terminals, station grounds and necessary additional trackage, or which would jeopardize the safety of the public."

The county argues that the statute is "irrelevant" because a pedestrian pathway is not a "highway." We have held above that for purposes of the PUC's authority over grade crossings under ORS 763.020(1), the word "highway" is not dependent on vehicular as against pedestrian use. The use of "highway" in that statute does not necessarily correspond to its use in former ORS 368.290, but in the context we conclude that the same considerations apply. Subsection (2) used the word "road" apparently as a synonym for "highway."[5] This statute, too, is concerned with use of a railroad's right of way, not for any county purpose whatever, but specifically for "highway" purposes, that is to say, for traffic, travel, and transportation. Again, there is no reason to believe that the legislature intended to distinguish pedestrian traffic from

---

[5] The 1981 revision, ORS 368.116, replaced "highway" with "public road."

wheeled traffic, nor that it intended the county's proposed "highway" use to be of any particular width or physical character.

The county also relies on former ORS 368.405(2) (replaced in 1981 by ORS 368.096) as recognizing the acquisition of public ways by prescription. Former ORS 368.405 dealt generally with a county's acquisition of real property for public road purposes, and subsection (2) read: "This section does not preclude acquiring public ways by adverse user." The subsection expressly stated that "[t]his section" did not preclude prescriptive acquisitions. It did not state that other law outside ORS 368.405 might not preclude this means of acquisition of particular kinds of property. Former ORS 368.405 has no effect on the interpretation of former ORS 368.290 as to a county's use of a railroad right of way for highway purposes.

 The Court of Appeals assumed that both statutes applied to pedestrian ways. It ruled that former ORS 368.290 did not preclude prescriptive acquisition of a roadway easement across a railroad right of way for two reasons. First, the court held that the statutory words "location, relocation, construction or betterment of any highway" did not apply because "[t]he county in this proceeding seeks only judicial recognition of an acquired right over an existing way that is already located and constructed." 62 Or App at 639. Although the point of the sentence is not entirely clear, we take it to mean that the statute does not apply when a county acquires an existing private roadway across a railroad's right of way for a public road if the location or physical character of the road is not changed. It well may be that under such circumstances the Railroad cannot show any new infringement upon its right of way and would have little to claim in a negotiation or an eventual eminent domain proceeding. Nonetheless, the change from private road to public highway constitutes the "location" of a highway and potentially involves a change in use, so that the statute contemplates an effort to obtain the Railroad's agreement. Of course, if the county asserts a previously "acquired right" of its own for highway purposes, it cannot well claim that this previous acquisition was not a "location" under the statute.

■ Second, the Court of Appeals held that former ORS 368.290 was "permissive, not mandatory" and did not provide the exclusive means for counties to acquire the use of a railroad right of way for highway purposes. The statute has been set out above. Subsection (1) stated that the county "may negotiate and agree with the railroad company for the right to use or occupy the right of way, or so much thereof as is necessary for highway purposes." If this subsection stood alone, we would agree that it would be a mere authorization, and at least under modern views of delegated or autonomous county authority it would hardly be needed. Subsection (2) stated that the county might condemn the necessary rights "[i]n case no satisfactory agreement can be effected."[6] That, too, could be only an authorization, although one that was made necessary by prior judicial decision, and the opening condition that negotiations must have failed suggests that the statute intends a mandatory sequence. It may be true that these two subsections do not exhaust the ways in which a county might obtain the use of a railroad right of way for highway purposes; for example, they do not include a simple gift, consent, or dedication without negotiations.

Finally, former ORS 368.290(3) provided that the foregoing authority granted to the counties did not extend to "use or occupancy of the railroad right of way which would interfere with the operation of the railroad or its necessary appurtenances [including necessary additional trackage], or which would jeopardize the safety of the public." We conclude that the three subsections, read together, intended no mere authorization in addition to whatever other means counties might have to locate a highway on a railroad right of way, but that the statute, along with the 1917 statute discussed in Part I, was designed to state a complete policy toward that problem. That policy required either the railroad's consent or the use of condemnation procedure. These formal means were denied if the result would be interference with railroad operations or danger to the public, matters for which the PUC permit also was required. The question is whether a county nevertheless might acquire the right to use or occupy part of a railroad's

---

[6] There is a potential ambiguity whether the words "acquire the right of way" in subsection (2) referred to the railroad's right of way, as these words do elsewhere in the section, or to an overriding right of way to be acquired by the county, but the question does not arise in this case.

right of way for road purposes by the informal means of prescriptive use.

The statute was first enacted in 1919. In 1913, this court had decided that a county could not by eminent domain take property that was used for a railroad's right of way. *O-W R & Nav Co v. Castner,* 66 Or 580, 135 P 174 (1913). In that case, the railroad's petition for a restraining order alleged that the railroad's business as a common carrier required it to build a second main line track, that citizens of Hood River County had initiated procedures under the county road statutes for condemning a longitudinal strip of the railroad's right of way for a public highway, and that the loss of this strip would destroy the railroad's ability to construct its second track or safely operate its single track railroad. In holding that the petition survived a demurrer, McNary, J., wrote:

> "We have no hesitation in declaring the law of this state will not permit any corporation, whatever be its legal or political character, to deprive a railroad beyond its legitimate needs, of its right of way longitudinally when the property is being used by such railroad in the performance of its public functions as a common carrier."

66 Or at 587. The 1919 legislation which became former ORS 368.290 addressed both aspects of the problem in *O-W R & Nav Co* when it provided that counties might condemn part of a railroad's right of way for highway purposes after an unsuccessful effort to negotiate an agreement, but not if this would interfere with railroad operations or public safety. As stated in Part I, those concerns had been made a responsibility of the PUC, at least as to crossings, in 1917.

The existing law stated in *O-W R & Nav Co v. Castner, supra,* clearly postulated that a railroad's right of way requirements as a common carrier took precedence over county road purposes. Nothing suggests that this postulate would differ if the public in a county used part of the right of way for the prescriptive period. The priority for railroad operations and public safety stated in subsection (3) of former ORS 368.290 in terms only limits the new authority granted in subsections (1) and (2), but it would be inconsistent to hold that regardless of interference with railroad operations or public safety the county could occupy a railroad right of way for highway purposes outside the statute by prescriptive use.

We need not here consider a hypothetical adverse use involving no such interference.

■ Because we reach this conclusion about former ORS 368.290, we hold that the circuit court should have granted the Railroad's motion to dismiss the county's suit. We therefore have no occasion to examine the nature and legal characteristics of a "public easement," the "adverse use" needed to establish such a public right, the attribution of such a right, as a property interest or otherwise, to the county as distinct from the state or other public entities, and other issues that have been discussed in this case. These are difficult and unsettled questions, but they need not be pursued here.[7]

## III. CONCLUSION.

As Part I explains, the decision of this suit is not a conclusive determination whether there should be a public crossing over the Railroad's tracks at N.E. 52nd Avenue. That question may be raised before the PUC by the county or another representative of the public, including the PUC itself. ORS 763.020. In this suit we only decide that former ORS 368.290 precluded the county's claim to have acquired a public easement across the Railroad's right of way for highway use, whether vehicular or pedestrian.

The decision of the Court of Appeals is reversed, and the case is remanded to the circuit court with directions to dismiss plaintiff's suit.

---

[7] One recurring problem is to distinguish between an "adverse" use and an implication of dedication from consented use, which ordinarily requires acceptance. *See, e.g., Doyle Milling v. Georgia-Pacific,* 256 Or 271, 276, n. 1, 473 P2d 135 (1970); *Huggett v. Moran,* 201 Or 105, 108-112, 266 P2d 692 (1954); 4 Tiffany, The Law of Real Property 1057-1066 (3rd ed); Parks, *The Law of Dedication in Oregon,* 20 Or L Rev 111, 122-25 (1941). Another problem is whether public use gives the county ownership of a prescriptive easement as a real property interest, of which it can dispose, when it does not claim or accept the asserted easement as a public road. In this case, the county claims to sue only on behalf of a concern of its citizens, *see* ORS 203.010(1), (4), but the circuit court declared the county the owner of an easement by prescription. *Compare State ex rel Thornton v. Hay,* 254 Or 584, 462 P2d 671 (1969), where a statutory action was brought by the state. The Connecticut Supreme Court has held that the "unorganized public cannot acquire an easement by grant or prescription," *Miller v. Grossman Shoes, Inc.,* 186 Conn 229, 440 A2d 302 (1982), so that such a property interest can only exist in an entity capable of relinquishing or disposing of it.