Argued and submitted November 7, 1984, affirmed in part, reversed in part, and remanded March 6, 1985

HUMPHERS,
*Respondent on Review,*

*v.*

FIRST INTERSTATE BANK OF OREGON,
*Petitioner on Review.*

(A 82-09-05889; CA A28047; SC S30908)

696 P2d 527

Cynthia S. C. Shanahan, Portland, argued the case for petitioner on review. With her on the briefs were Ridgway K. Foley, Jr., and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

David J. Sweeney, Portland, argued the cause for respondent on review. With him on the briefs were Judith A.

Scholz, Mark B. Weintraub and Gilbertson, Brownstein, Rask, Sweeney, Kerr & Grim, Portland.

LINDE, J.

## LINDE, J.

We are called upon to decide whether plaintiff has stated a claim for damages in alleging that her former physician revealed her identity to a daughter whom she had given up for adoption.

In 1959, according to the complaint, plaintiff, then known as Ramona Elwess or by her maiden name, Ramona Jean Peek, gave birth to a daughter in St. Charles Medical Center in Bend, Oregon. She was unmarried at the time, and her physician, Dr. Harry E. Mackey, registered her in the hospital as "Mrs. Jean Smith." The next day, Ramona consented to the child's adoption by Leslie and Shirley Swarens of Bend, who named her Leslie Dawn. The hospital's medical records concerning the birth were sealed and marked to show that they were not public. Ramona subsequently remarried and raised a family. Only Ramona's mother and husband and Dr. Mackey knew about the daughter she had given up for adoption.

Twenty-one years later the daughter, now known as Dawn Kastning, wished to establish contact with her biological mother. Unable to gain access to the confidential court file of her adoption (though apparently able to locate the attending physician), Dawn sought out Dr. Mackey, and he agreed to assist in her quest. Dr. Mackey gave Dawn a letter which stated that he had registered Ramona Jean Peek at the hospital, that although he could not locate his medical records, he remembered administering diethylstilbestrol to her, and that the possible consequences of this medication made it important for Dawn to find her biological mother. The latter statements were untrue and made only to help Dawn to breach the confidentiality of the records concerning her birth and adoption. In 1982, hospital personnel, relying on Dr. Mackey's letter, allowed Dawn to make copies of plaintiff's medical records, which enabled her to locate plaintiff, now Ramona Humphers.

Ramona Humphers was not pleased. The unexpected development upset her and caused her emotional distress, worry, sleeplessness, humiliation, embarrassment, and inability to function normally. She sought damages from the estate of Dr. Mackey, who had died, by this action against defendant as the personal representative. After alleging the facts recounted above, her complaint pleads for relief on five

different theories: First, that Dr. Mackey incurred liability for "outrageous conduct";[1] second, that his disclosure of a professional secret fell short of the care, skill and diligence employed by other physicians in the community and commanded by statute; third, that his disclosure wrongfully breached a confidential or privileged relationship; fourth, that his disclosure of confidential information was an "invasion of privacy" in the form of an "unauthorized intrusion upon plaintiff's seclusion, solitude, and private affairs;" and fifth, that his disclosures to Dawn Kastning breached a contractual obligation of secrecy. The circuit court granted defendant's motion to dismiss the complaint on the grounds that the facts fell short of each theory of relief and ordered entry of judgment for defendant. On appeal, the Court of Appeals affirmed the dismissal of the first, second, and fifth counts but reversed on the third, breach of a confidential relationship, and the fourth, invasion of privacy. *Humphers v. First Interstate Bank of Oregon,* 68 Or App 573, 684 P2d 581 (1984). We allowed review. We hold that if plaintiff has a claim, it arose from a breach by Dr. Mackey of a professional duty to keep plaintiff's secret rather than from a violation of plaintiff's privacy.

A physician's liability for disclosing confidential information about a patient is not a new problem. In common-law jurisdictions it has been more discussed than litigated throughout much of this century.[2] There are precedents for damage actions for unauthorized disclosure of facts conveyed in confidence, although we know of none involving the disclosure of an adoption. Because such claims are made against a variety of defendants besides physicians or other professional counselors, for instance against banks, *see, e.g., Peterson v. Idaho First National Bank,* 83 Idaho 578, 367 P2d 284

---

[1] This court has attempted, so far unsuccessfully, to discourage the idea that there is a general tort of "outrageous conduct," partly because the phrase misleadingly suggests potential recovery of damages whenever someone's conduct could be said to deserve this epithet. *See Hall v. The May Dept. Stores,* 292 Or 131, 134-37, 637 P2d 126 (1981); *Brewer v. Erwin,* 287 Or 435, 454-57, 600 P2d 398 (1979); and see *id.* at n 13, citing the court's dissatisfaction with the epithets in *Rockhill v. Pollard,* 259 Or 54, 60, 485 P2d 28 (1971). Plaintiff in this case actually alleged the factual elements of intentional or reckless infliction of severe emotional distress as well as "outrageous" conduct.

[2] *See, e.g.,* Hanning and Brady, *Extrajudicial Truthful Disclosure of Medical Confidences: A Physician's Civil Liability,* 44 Den L J 463 (1967) (citing the earlier literature); Boyle, *Medical Confidence—Civil Liability for Breach,* 24 N Ire Leg Q 19 (1973).

(1961), and because plaintiffs understandably plead alternative theories of recovery, the decisions do not always rest on a single theory.

Sometimes, a defendant may have promised confidentiality expressly or by factual implication, in this case perhaps implied by registering a patient in the hospital under an assumed name. Plaintiffs were allowed to proceed on implied contract claims in *Horne v. Patton,* 291 Ala 701, 287 So2d 824 (1973), in *Hammonds v. Aetna Casualty & Surety Company,* 243 F Supp 793 (ND Ohio 1965), and in *Doe v. Roe,* 400 NYS2d 668 (Sup Ct 1977) (psychiatrist). That was the basis of an early Scottish decision against a doctor who revealed the apparent premarital conception of a child to a minister, causing the plaintiff's expulsion from the church.[3] *A.B. v. C.D.,* (1851) 14 Dunlop 177. A contract claim may be adequate where the breach of confidence causes financial loss, and it may gain a longer period of limitations;[4] but contract law may deny damages for psychic or emotional injury not within the contemplation of the contracting parties, *see Farris v. U.S. Fid. and Guar. Co.,* 284 Or 453, 587 P2d 1015 (1978), though perhaps this is no barrier when emotional security is the very object of the promised confidentiality. A contract claim is unavailable if the defendant physician was engaged by someone other than the plaintiff, *see Quarles v. Sutherland,* 215 Tenn 651, 389 SW2d 249 (1965)(denying claim by injured customer treated by store's doctor), and it would be an awkward fiction at best if age, mental condition, or other circumstances prevent the patient from contracting; yet such a claim might be available to someone less interested than the patient, for instance her husband, *Clayman v. Bernstein,* 38 Pa D & C 543 (1940).

Malpractice claims, based on negligence or statute, in contrast, may offer a plaintiff professional standards of conduct independent of the defendant's assent. In *Furniss v. Fitchett,* [1958] N.Z.L.R. 396 (S.C.), a wife was convinced that her husband was insane and was doping her, and the couple's physician gave the distraught husband a document stating

---

[3] Or, in Scotland, the pursuer's expulsion from the kirk.

[4] *Compare Securities-Intermountain v. Sunset Fuel,* 289 Or 243, 611 P2d 1158 (1980) *with Dowell v. Mossberg,* 226 Or 173, 359 P2d 541 (1961).

that the wife's suspicions were a paranoid delusion. The New Zealand Supreme Court held the physician liable for foreseeable harm to the wife (whom he had not told of the diagnosis) under the "general conception of relations giving rise to a duty of care" stated in *Donoghue v. Stevenson,* [1932] A.C. 562. But the court found this duty in the relation between doctor and patient; a claim of negligence is unavailable against a defendant not bound to confidentiality by such professional standards. Finally, actions for intentional infliction of severe emotional distress, *see supra* note 1, fail when the defendant had no such intention or, in a context of independent responsibility such as that of the physician in *Rockhill v. Pollard,* 259 Or 54, 485 P2d 28 (1971), when a defendant was not reckless or did not behave in a manner that a factfinder could find to transcend "the farthest reaches of socially tolerable behavior." *Hall v. The May Dept. Stores,* 292 Or 131, 137, 637 P2d 126 (1981). Among these diverse precedents, we need only consider the counts of breach of confidential relationship and invasion of privacy on which the Court of Appeals allowed plaintiff to proceed. Plaintiff did not pursue her other theories in her response to the petition for review, ORAP 10.15 (2), and we express no view whether the dismissal of those counts was correct.

## PRIVACY

Although claims of a breach of privacy and of wrongful disclosure of confidential information may seem very similar in a case like the present, which involves the disclosure of an intimate personal secret, the two claims depend on different premises and cover different ground. Their common denominator is that both assert a right to control information, but they differ in important respects. Not every secret concerns personal or private information; commercial secrets are not personal, and governmental secrets are neither personal nor private. Secrecy involves intentional concealment. "But privacy need not hide; and secrecy hides far more than what is private." Bok, Secrets 11 (1983).

For our immediate purpose, the most important distinction is that only one who holds information in confidence can be charged with a breach of confidence. If an act qualifies as a tortious invasion of privacy, it theoretically could be committed by anyone. In the present case, Dr. Mackey's

professional role is relevant to a claim that he breached a duty of confidentiality, but he could be charged with an invasion of plaintiff's privacy only if anyone else who told Dawn Kastning the facts of her birth without a special privilege to do so would be liable in tort for invading the privacy of her mother.

Whether "privacy" is a usable legal category has been much debated in other English-speaking jurisdictions as well as in this country, especially since its use in tort law, to claim the protection of government against intrusions by others, became entangled with its use in constitutional law, to claim protection against rather different intrusions by government.[5] No concept in modern law has unleashed a comparable flood of commentary, its defenders arguing that "privacy" encompasses related interests of personality and autonomy, while its critics say that these interests are properly identified, evaluated, and protected below that exalted philosophical level.[6]

---

[5] *See Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965) (marital use of contraceptives as privileged "privacy"). *Compare Katz v. United States,* 389 US 347, 350, 88 S Ct 507, 19 L Ed 2d 576 (1967): "[T]he Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all," *with id.* at 360 (Harlan, J. concurring): "[A]n enclosed telephone booth is an area where * * * a person has a constitutionally protected expectation of privacy."

Not surprisingly, elevating all interests of personality to constitutional rights has produced theories that the United States Constitution requires the states to guarantee the parent a "privacy" right not to have an adoption disclosed, *see* Note, *Sealed Adoption Records and the Constitutional Right of Privacy of the Natural Parent,* 34 Rut L Rev 451 (1982), and that the same constitution guarantees the adopted child a "privacy" right to learn his or her genealogical identity, Note, *The Adult Adoptee's Constitutional Right to Know His Origins,* 48 S Cal L Rev 1196 (1975). A New Jersey court confronted these competing demands in *Mills v. Atlantic City Dept. of Vit. Statistics,* 148 NJ Super 302, 372 A2d 646 (1977).

[6] A number of sources are cited in *Sterling v. Cupp,* 290 Or 611, 614 n 3, 615-16, 625 P2d 123 (1981). One recent defender of "privacy" stated the dispute as follows:

"Commentators have argued that privacy rhetoric is misleading: when we study the cases in which the law (or our moral intuitions) suggest that a 'right to privacy' has been violated, we always find that some other interest has been involved. Consequently, they argue, our understanding of privacy will be improved if we disregard the rhetoric, look behind the decisions, and identify the real interests protected, [citing sources].

"* * * * *

"This Article is an attempt to vindicate the way most of us think and talk about privacy issues: unlike the reductionists, most of us consider privacy to be a useful concept. To be useful, however, the concept must denote something that is distinct and coherent. * * *

"Our everyday speech suggests that we believe the concept of privacy is

Indeed, at that level, a daughter's interest in her personal identity here confronts a mother's interest in guarding her own present identity by concealing their joint past. But recognition of an interest or value deserving protection states only half a case. Tort liability depends on the defendant's wrong as well as on the plaintiff's interest, or "right," unless some rule imposes strict liability. One's preferred seclusion or anonymity may be lost in many ways; the question remains who is legally bound to protect those interests at the risk of liability.

Partly for such reasons, English common law has not developed a general tort theory of "privacy."[7] The advisability of introducing such a tort was studied and rejected in 1972 by a special Committee on Privacy in favor of developing clearer remedies for breaches of confidence,[8] and in 1981 the Law Commission recommended a codification of such remedies for the unauthorized disclosure of information that the defendant is obliged not to reveal.[9] The distinctions between the two approaches discussed in England involve the same issues we face in this case, except insofar as English lawmaking is not confined by constitutional guarantees of freedom of speech or publication.

---

indeed coherent and useful * * *."

Gavison, *Privacy and the Limits of Law,* 89 Yale L J 421, 422 (1980). The last sentence characterizes a method that approaches analysis from the assumption that a commonly used word must reflect a coherent core of meaning. Interestingly, however, an examination of dictionaries suggests that while French, Spanish, and German have a cognate word for the adjective "private," translation of "privacy" splits into distinct nouns connoting the different meanings identified by the "reductionists" and by American tort law.

[7] A proponent of such a theory has collected numerous examples to show that "privacy" is the value actually protected in English decisions based on some other theory, but this practice is consistent with attention to the defendant's wrong as well as to the plaintiff's interest. Seipp, *English Judicial Recognition of a Right to Privacy,* 3 Oxford J Leg Stud 325 (1983). This article, at 367-68, also reviews the law of privacy in other common law jurisdictions, as well as (at 350-53) implications for English law of references to a right of privacy in international human rights documents, including Article 12 of the Universal Declaration of Human Rights, UN Doc A/811 (1948) ("No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence. * * * Everyone has the right to the protection of the law against such interference * * *."), and Article 8(1) of the European Convention on Human Rights, 213 UNTS 221, Cmnd 8969 (1953) ("Everyone has the right to respect for his private and family life, his home and his correspondence"), which, unlike the Universal Declaration, the United Kingdom has accepted as a treaty obligation.

[8] Report of the Committee on Privacy (HMSO 1972) Cmnd 5012.

[9] Law Commission, Breach of Confidence (Law Comm No 110, 1981).

In this country, Dean William L. Prosser and his successors, noting that early debate was more "preoccupied with the question whether the right of privacy existed" than "what it would amount to if it did," concluded that invasion of privacy "is not one tort but a complex of four":

> "To date the law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.' "

Prosser and Keeton, Torts 851, § 117 (5th ed 1984). They identify the four kinds of claims grouped under the "privacy" tort as, first, appropriation of the plaintiff's name or likeness; second, unreasonable and offensive intrusion upon the seclusion of another; third, public disclosure of private facts; and fourth, publicity which places the plaintiff in a false light in the public eye. *Id.* at 851-66. The same classification is made in the Restatement (Second) Torts §§ 652A to 652E. Only the third of these was the concern of Brandeis and Warren's famous article,[10] and its scope and significance were questioned by Professor Harry Kalven, Jr., even before television reporting made the display of private events and emotions its daily routine beyond the wildest imagination of those nineteenth century Bostonians. Kalven, *Privacy in Tort Law— Were Warren and Brandeis Wrong?* 31 L & Contemp Prob 326 (1966).

This court has not adopted all forms of the tort wholesale. It first confronted a claim for damages for "invasion of privacy" in *Hinish v. Meier & Frank Co.,* 166 Or 482, 113 P2d 438 (1941), in which plaintiff's name had been signed without his consent to a telegram urging the state's governor to veto a bill. Most of Justice Lusk's opinion was devoted to reviewing the evolving caselaw in other states in order to establish that there might be a tort that this court could recognize despite the lack of Oregon precedents. Having done that, the opinion disposed of the actual claim by the brief assertion that if, as alleged, the defendants appropriated plaintiff's "name, his personality and whatever influence he may have possessed, and injected them into a political controversy in which, as far as appears, he had no interest," they

---

[10] Brandeis and Warren, *The Right to Privacy,* 4 Harv L Rev 193 (1890).

"had no legal right" to do so and became liable to the plaintiff for damages. *Id.* at 506. *Hinish* fell within the first of the four kinds of claims identified above.

An essential element in *Hinish* was the allegation that plaintiff's name was used without his consent and against his will, in other words, that using his name on the telegram was fraudulent. The case does not hold that it would be an actionable invasion of privacy to write the governor that "Mr. Hinish, too, opposes this bill," if Hinish had made such a statement to the writer. The false appropriation, not the potential public exposure of Hinish's actual views, constituted the tort.

*Tollefson v. Price,* 247 Or 398, 430 P2d 990 (1967) was a case of the third kind, offensive publication of private facts. Defendants allegedly included Mrs. Tollefson's name in a list of delinquent debts advertised for sale in a public document and in a local newspaper, wrongly stating that the debts were undisputed. Three concurring judges emphasized that the complaint alleged the specific purpose to harass, vex and annoy the plaintiffs. *Id.* at 403. Deliberately harassing debt collection methods may be tortious without publicity or "invasion of privacy." *Turman v. Central Billing Bureau, Inc.,* 279 Or 443, 568 P2d 1382 (1977). Two weeks after *Tollefson,* Justice O'Connell noted the disputed character of tort protection for a right of privacy in *French v. Safeway Stores,* 247 Or 554, 556-57, 430 P2d 1021 (1967), in rejecting a claim for damages when a store manager's note to store employees stated that plaintiff's relatives did not trust plaintiff to do his own shopping.

Here there is no claim of offensive publicity. The Court of Appeals concluded that the complaint alleges a case of tortious intrusion upon plaintiff's seclusion, not by physical means such as uninvited entry, wiretapping, photography, or the like, but in the sense of an offensive prying into personal matters that plaintiff reasonably has sought to keep private. *See* Prosser and Keeton, *supra* at 854-55, § 117.[11] We do not

---

[11] Hospital patients have recovered on a variety of theories for what courts recognized as an injury to privacy when the patient, without knowing consent, was exposed to nonmedical personnel, beginning with *DeMay v. Roberts,* 46 Mich 160, 9 NW 146 (1881) (finding the nonmedical stranger's touch to be a battery). *See* LeBlang, *Invasion of Privacy: Medical Practice and the Tort of Intrusion,* 18 Washburn L J 205,

believe that the theory fits this case.

Doubtless plaintiff's interest qualifies as a "privacy" interest. That does not require the judgment of a court or a jury; it is established by the statutes that close adoption records to inspection without a court order. ORS 7.211, 432.420.[12] The statutes are designed to protect privacy interests of the natural parents, the adoptive parents, or the child. But as already stated, to identify an interest deserving protection does not suffice to collect damages from anyone who causes injury to that interest. Dr. Mackey helped Dawn Kastning find her biological mother, but we are not prepared to assume that Ms. Kastning became liable for invasion of privacy in seeking her out.[13] Nor, we think, would anyone who

---

219-39 (1979). This court recognized that intrusive surveillance could be a tort, though not made out on the facts, in *McLain v. Boise Cascade Corp.,* 271 Or 549, 533 P2d 343 (1975).

[12] ORS 7.211 provides:

"(1) The clerk or court administrator of any court having jurisdiction over adoption cases shall keep separate records in all cases of adoption filed in such court. The records shall not be subject to inspection of any person, except upon order of the court. Adoption proceedings shall not be entered upon the general journal or other records of the court, nor shall the clerk or court administrator disclose to any person, without the court order, any information appearing in the adoption records. The clerk, court administrator or any other person having custody of any records or files in such cases shall not disclose them to any person without the court order. Nothing contained in this section shall prevent the clerk or court administrator from certifying copies of a decree of adoption to the petitioners in such proceedings or their attorney. At the time of the entry of any final decree of adoption, the clerk, court administrator or other person having custody of the files in such cases shall cause all records, papers and files relating to the adoption to be sealed in the record of the case and such sealed records, papers and files shall not be unsealed, opened or subject to the inspection of any person except upon order of a court of competent jurisdiction."

ORS 432.420 provides:

"[Sealed adoption documents] may be opened by the State Registrar only upon an order of a court of competent jurisdiction or when requested by an agency operating a voluntary adoption registry as defined in ORS 109.425 for the purpose of facilitating the identification of persons registering under the provisions of ORS 109.425 and 109.435 to 109.500."

In 1983, after the events in this case, the legislature enacted a permissive system for the voluntary registry of adoptees, adoptive parents, and "birth parents" to facilitate later consensual identification and transmission of health and genetic data. Or Laws 1983, ch 672, codified at ORS 109.425 to 109.500. The statute expressly "fully recognizes the right to privacy and confidentiality of birth parents whose children were adopted, the adoptees and the adoptive parents." ORS 109.430.

[13] The use of a false medical document to gain access to the records of St. Charles Medical Center resembles Illustration 4 to Restatement (Second) Torts § 652B (based on *Brex v. Smith,* 104 NJ Eq 386, 146 A 34 (1929)), in which defendant obtains bank

knew the facts without an obligation of secrecy commit a tort simply by telling them to Ms. Kastning.

Dr. Mackey himself did not approach plaintiff or pry into any personal facts that he did not know; indeed, if he had written or spoken to his former patient to tell her that her daughter was eager to find her, it would be hard to describe such a communication alone as an invasion of privacy. The point of the claim against Dr. Mackey is not that he pried into a confidence but that he failed to keep one. If Dr. Mackey incurred liability for that, it must result from an obligation of confidentiality beyond any general duty of people at large not to invade one another's privacy. We therefore turn to plaintiff's claim that Dr. Mackey was liable for a breach of confidence, the third count of the complaint.

## BREACH OF CONFIDENCE

It takes less judicial innovation to recognize this claim than the Court of Appeals thought.[14] A number of decisions have held that unauthorized and unprivileged disclosure of confidential information obtained in a confidential relationship can give rise to tort damages. *See, e.g., Horne v. Patton, supra; McDonald v. Clinger,* 446 NYS 2d 801 (App Div 1982); and *cf. Furniss v. Fitchett, supra.* The theory that a wrongful breach of confidence would be actionable goes back at least to *Simonsen v. Swenson,* 104 Neb 224, 177 NW 831 (1920), though the physician's disclosure in that case was found to be privileged. *See also Smith v. Driscoll,* 94 Wash 441, 162 P 572 (1917)(dicta).

---

records by displaying a forged court order. But Dawn Kastning is not a defendant here, and the complaint does not allege that she asked Dr. Mackey to prepare a false letter or knew that it was false.

Plaintiff's interest in nondisclosure would have been just as much invaded if the letter had been true and if Ms. Kastning had obtained a court order upon showing medical necessity, but the intrusive conduct would lack the wrongfulness required for liability.

[14] The Court of Appeals wrote that neither it nor this court has "hesitated to create new torts," for which the court cited its own decision in *Norwest v. Presbyterian Intercommunity Hosp.,* 52 Or App 853, 855, 631 P2d 1377, "*rev den* 291 Or 771 (1981)," unaccountably misstating this court's actual allowance of review and statement of a very different approach to the sources of tort liability. *Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 545-48, 652 P2d 318 (1982). Granted that at times a court must decide a new point of law that necessarily will establish either a right in the plaintiff or a privilege or immunity in the defendant, *Hinish v. Meier & Frank Co., supra* 166 Or at 503, at least we do hesitate long enough to examine the premises for or against a "new tort."

One commentator, upon analyzing the cases allowing or denying recovery on a variety of theories, concluded that the tort consists in a breach of confidence in a "nonpersonal" confidential relationship, using the word "nonpersonal" to exclude liability for failing to keep secrets among members of a family or close friends. Note, *Breach of Confidence: An Emerging Tort*, 82 Colum L Rev 1426 (1982). The problem with this formulation of civil liability lies in identifying the confidential relationships that carry a duty of keeping secrets. The writer suggests that the duty arises in all nonpersonal relationships "customarily understood" to carry such an obligation. *Id.* at 1460-61. In any such relationship, a person who discloses personal information conveyed in confidence would have the burden of showing that the disclosure was justified or privileged.

We do not think the law casts so wide a net. It requires more than custom to impose legal restraints on "the right to speak, write, or print freely on any subject whatever." Or Const, Art I, § 8. Tort liability, of course, may be a remedy for "injury to person, property, or reputation," Or Const, Art I, § 10, even by speech. *See Hall v. The May Dept. Stores, supra* (liability for abusive accusations in employment relationship). But a legal duty not to speak, unless voluntarily assumed in entering the relationship, will not be imposed by courts or jurors in the name of custom or reasonable expectations. Tort liability is the consequence of a nonconsensual duty of silence, not its source.

In the case of the medical profession, courts in fact have found sources of a nonconsensual duty of confidentiality. Some have thought such a duty toward the patient implicit in the patient's statutory privilege to exclude the doctor's testimony in litigation, enacted in this state in OEC 504-1(2). *See, e.g., Berry v. Moench*, 8 Utah 2d 191, 331 P2d 814 (1958); *Hammonds v. Aetna Cas. & Sur. Co., supra;* and *cf. Quarles v. Sutherland, supra,* noting the absence of such legislation in Tennessee. More directly in point are legal duties imposed as a condition of engaging in the professional practice of medicine or other occupations.[15]

---

[15] *See, e.g., In re Lasswell*, 296 Or 121, 124-26, 673 P2d 855 (1983) (sustaining professional constraints on disclosure if disclosure is incompatible with professional function and sanction is limited to the professional role or relationship). In *Bob*

As early as 1920, the Supreme Court of Nebraska, where a medical licensing statute defined professional misconduct to include "betrayal of a professional secret to the detriment of the patient," wrote in *Simonsen v. Swenson, supra,* 104 Neb at 227:

> "By this statute, it appears to us, a positive duty is imposed upon the physician, both for the benefit and advantage of the patient as well as in the interest of general public policy. The relation of physician and patient is necessarily a highly confidential one. It is often necessary for the patient to give information about himself which would be most embarrassing or harmful to him if given general circulation. This information the physician is bound, not only upon his own professional honor and the ethics of his high profession, to keep secret, but by reason of the affirmative mandate of the statute itself. A wrongful breach of such confidence, and a betrayal of such trust, would give rise to a civil action for the damages naturally flowing from such wrong."

Professional regulations were similarly cited in *Hammonds v. Aetna Cas. & Sur. Co., supra,* in *Doe v. Roe, supra,* and in *Clark v. Geraci,* 208 NYS2d 564 (Sup Ct 1960). *See also Munzer v. Blaisdell,* 49 NYS2d 915 (Sup Ct 1944) (hospital records).

This strikes us as the right approach to a claim of liability outside obligations undertaken expressly or implied in fact in entering a contractual relationship. *See* DeWitt, *Medical Ethics and the Law: The Conflict of Dual Allegiances,* 5 W Res L Rev 5, 21 (1953). The contours of the asserted duty of confidentiality are determined by a legal source external to the tort claim itself. A plaintiff asserting a breach of such a nonconsensual duty must identify its source and terms. If the tort claim asserts violation of a statute or regulation, the rule must validly apply to the facts, whether or not it actually is applied by those responsible for enforcement. When the asserted rule is one administered by a specialized agency, such as a professional board, and its scope is disputed, this may on

---

*Godfrey Pontiac, Inc. v. Roloff,* 291 Or 318, 630 P2d 840 (1981), we denied liability for a lawyer's alleged breach of a professional rule proscribing false or misleading statements in litigation, ORS 9.460. Besides concluding that the legislature did not intend to create civil liability, the court noted that the plaintiff had alleged no special injury beyond the expense and trouble of the litigation itself, unlike the types of injury alleged by the present plaintiff. *Compare McEvoy v. Helikson,* 277 Or 781, 562 P2d 540 (1977) (attorney liable for mental anguish resulting from attorney's failure to comply with court order).

occasion require reference to the agency's primary jurisdiction if the court does not find application of the rule to the facts clear as a matter of law. This might have been the correct approach in *Howe v. Pioneer Telephone*, 251 Or 385, 445 P2d 875 (1968), in which defendant relied on a regulation of the Public Utility Commissioner in defense against an action for damages. *Cf. also Mult. Co. v. Union Pac. R.R.*, 297 Or 341, 685 P2d 988 (1984).

Because the duty of confidentiality is determined by standards outside the tort claim for its breach, so are the defenses of privilege or justification. Physicians, like members of many ordinarily confidential professions and occupations, also may be legally obliged to report medical information to others for the protection of the patient, of other individuals, or of the public. *See, e.g.,* ORS 418.750 (physician's duty to report child abuse); ORS 433.003, 434.020 (duty to report certain diseases). That was true of the defendant in *Simonsen v. Swenson, supra,* who reported a guest's contagious disease to a hotel. The court noted that this disclosure was legally required and affirmed a directed verdict for the defendant. Even without such a legal obligation, there may be a privilege to disclose information for the safety of individuals or important to the public in matters of public interest. *See* Note, *Breach of Confidence: An Emerging Tort, supra* at 1462-68. Some cases have found a physician privileged in disclosing information to a patient's spouse, *Curry v. Corn,* 277 NYS2d 470 (Sup Ct 1966), or perhaps an intended spouse, *Berry v. Moench, supra.* In any event, defenses to a duty of confidentiality are determined in the same manner as the existence and scope of the duty itself. They necessarily will differ from one occupation to another and from time to time. A physician or other member of a regulated occupation is not to be held to a noncontractual duty of secrecy in a tort action when disclosure would not be a breach or would be privileged in direct enforcement of the underlying duty.

A physician's duty to keep medical and related information about a patient in confidence is beyond question. It is imposed by statute. ORS 677.190(5) provides for disqualifying or otherwise disciplining a physician for "wilfully or negligently divulging a professional secret." The Court of Appeals thought that breach of this statutory provision could not lead

to civil liability when such liability would be quite inappropriate to other provisions of ORS 677.190, but that misses the point. The actionable wrong is the breach of duty in a confidential relationship; ORS 677.190(5) only establishes the duty of secrecy in the medical relationship. *See also* ORS 192.525, ORS 192.530.

It is less obvious whether Dr. Mackey violated ORS 677.190(5) when he told Dawn Kastning what he knew of her birth. She was not, after all, a stranger to that proceeding. Lord Mansfield, in denying a common law privilege against testimony of the Duchess of Kingston's surgeon concerning the birth of her child, said that "[i]f a surgeon was voluntarily to reveal these secrets, to be sure he would be guilty of a breach of honor, and of great indiscretion;"[16] but he was not speaking of revealing them to the child. If Ms. Kastning needed information about her natural mother for medical reasons, as Dr. Mackey pretended, the State Board of Medical Examiners likely would find the disclosure privileged against a charge under ORS 677.190(5); but the statement is alleged to have been a pretext designed to give her access to the hospital records. If only ORS 677.190(5) were involved, we do not know how the Board would judge a physician who assists at the birth of a child and decades later reveals to that person his or her parentage. But as already noted, other statutes specifically mandate the secrecy of adoption records. ORS 7.211 provides that court records in adoption cases may not be inspected or disclosed except upon court order, and ORS 432.420 requires a court order before sealed adoption records may be opened by the state registrar. Given these clear legal constraints, there is no privilege to disregard the professional duty imposed by ORS 677.190(5) solely in order to satisfy the curiosity of the person who was given up for adoption. *See also* ORS 192.525, ORS 192.530.

For these reasons, we agree with the Court of Appeals that plaintiff may proceed under her claim of breach of confidentiality in a confidential relationship. The decision of the Court of Appeals is reversed with respect to plaintiff's claim of invasion of privacy and affirmed with respect to her

---

[16] *R v. Kingston (Duchess)*, (1776) 20 Howell State Trials 355.

claim of breach of confidence in a confidential relationship, and the case is remanded to the circuit court for further proceedings on that claim.