Argued and submitted November 22, stay previously issued is lifted; judgment affirmed December 29, 1999, petition for review denied March 21, 2000
(330 Or 138)

Jane DOES 1, 2, 3, 4, 5, 6, and 7,
*Appellants,*

*v.*

STATE OF OREGON;
John A. Kitzhaber, Governor of Oregon;
and Edward Johnson, State Registrar of
the Center for Health Statistics in Oregon,
*Respondents,*

*and*

Helen HILL,
Curtis Endicott, Susan Updyke;
and the Oregon Adoptive Rights Association,
*Intervenors-Respondents.*

(98C-20424; CA A107235)

993 P2d 822

545-a 

I. Franklin Hunsaker argued the cause for appellants. With him on the briefs were Loren D. Podwill and Bullivant Houser Bailey, a professional corporation.

David Schuman, Deputy Attorney General, argued the cause for respondents. On the joint respondents' brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, Mary H. Williams, Assistant Solicitor General, and Brendan C. Dunn and Robert M. Atkinson, Assistant Attorneys General.

Thomas E. McDermott III argued the cause for intervenor-respondents. With him on the joint respondents' brief was Roy Pulvers.

Jeffrey M. Batchelor, Jeffrey M. Batchelor, P.C., Michael P. Bentzen, Hughes & Bentzen, and David M. McConkie, Merrill F. Nelson and Kirton & McConkie filed a brief *amicus curiae* for National Council for Adoption.

Before De Muniz, Presiding Judge, and Linder and Brewer, Judges.

DE MUNIZ, P. J.

**DE MUNIZ, P. J.**

Plaintiffs appeal from a summary judgment in favor of defendants State of Oregon and various state officials in their action for declaratory and injunctive relief to have voter-enacted initiative Measure 58 (1998) declared invalid and to enjoin the state from implementing that measure. Under Measure 58, adopted people over the age of 21 may gain access to their original birth certificates and thus may determine the identities of their birth mothers. Plaintiffs are women who surrendered children for adoption in Oregon between the years 1960 and 1994.[1] Intervenors include the Oregon Adoptive Rights Association, several adoptees (including the chief sponsor of Measure 58), and a birth mother who alleges that no promises of confidentiality were made when she surrendered a child for adoption in Oregon in 1967 and who desires contact with that child.

In this action, plaintiffs seek to prevent the disclosure of their children's birth certificates to the children they relinquished for adoption, arguing that Measure 58 violates the contracts clause of the state and federal constitutions and also unconstitutionally violates their rights to privacy under both constitutions. Each side moved for summary judgment, asserting that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. The trial court rejected plaintiffs' arguments and granted summary judgment in favor of defendants. For the reasons set forth below, we affirm.

Measure 58 provides:

> "Upon request of a written application to the state registrar, any adopted person 21 years of age or older born in the state of Oregon shall be issued a certified copy of his/her unaltered, original and unamended certificate of birth in the custody of the state registrar, with procedures, filing fees, and waiting periods identical to those imposed upon non-adopted citizens of the State of Oregon pursuant to ORS 432.120 and 432.146. Contains no exceptions."

---

[1] No questions are presented in this case concerning birth fathers. Thus, we limit our discussion solely to the questions presented in regard to birth mothers.

## PRELIMINARY ISSUE CONCERNING REMEDIES

In their second amended complaint filed in the trial court, plaintiffs sought to have the court declare Measure 58 unconstitutional and further sought to have the court enjoin defendants from implementing Measure 58. At the time of their initial filing, plaintiffs and the state defendants entered into a stipulation for issuance of a preliminary injunction restraining defendants and their agents from enforcing the provisions of Measure 58 until entry of the trial court judgment in this case.[2] After the trial court entered judgment in defendants' favor, plaintiffs moved for a stay of judgment pending appeal pursuant to ORS 19.350, which the trial court denied. Plaintiffs then moved this court for a stay of judgment pending a decision on appeal, asserting that they were seeking invalidation of Measure 58 in this action. We expedited the appeal and granted plaintiffs' motion for a stay of judgment on the ground that the appeal was taken in good faith and not for purposes of delay, that the denial of a stay would result in harm to appellants and could eviscerate the subject matter of the appeal before a decision on the merits was possible. *See generally* ORS 19.350(3), (5) (setting forth factors to be considered in determining whether stay should be granted).

In the course of briefing the issues to this court, plaintiffs filed a reply brief that specifically disavowed any facial challenge to the constitutionality of Measure 58 and asserted that they were only making an as-applied challenge to the constitutionality of the law. Plaintiffs indicated in their reply brief, and further clarified during oral argument of this case, that they were claiming only that Measure 58 was unconstitutional as applied to the six plaintiffs and to other birth mothers who received similar assurances of confidentiality; plaintiffs conceded that the measure would not be unconstitutional as to other birth mothers, such as the intervenor birth mother who received no assurances of confidentiality and who desires contact with her adopted child. *See generally Advocates for Effective Regulation v. City of Eugene,* 160 Or App 292, 299, 981 P2d 368 (1999) (in a facial challenge

---

[2] Intervenors had not yet intervened at that point and were not a party to the stipulation.

"the question is whether the challenged enactment is valid as written, as opposed to validly applied to a given set of facts").

■■■ Given plaintiffs' concession that Measure 58 is capable of at least some constitutional applications, the remedy of invalidation of the statute sought by plaintiffs in this action and the temporary remedy imposed by the stay of the judgment are not appropriate. Plaintiffs have sought invalidation of Measure 58, and the stay entered by this court enjoins any application of Measure 58 whatsoever. "It may be premised that injunction is a proper remedy to prevent enforcement of void legislation." *Kroner v. City of Portland*, 116 Or 141, 150, 240 P 536 (1925) (citing cases). It does not follow, however, that an injunction preventing all enforcement of legislation is a proper remedy when the plaintiffs do not contend that the legislation is void but contend only that the legislation, although constitutional as applied to others, would be unconstitutional as applied to *them. See generally Meltebeke v. Bureau of Labor and Industries*, 120 Or App 273, 280, 852 P2d 859 (1993), *aff'd* 322 Or 132, 903 P2d 351 (1995) (rule was "not invalid, because it has other constitutional applications and is not facially void").

Plaintiffs have presented no ground for enjoining enforcement of Measure 58 in its entirety, as they are not asserting that it is facially unconstitutional. Given plaintiffs' position, and without reference to the merits of their as-applied constitutional challenges to the measure, we conclude that the stay of judgment entered by this court preventing Measure 58 from going into effect must be lifted immediately, as it grants more relief than plaintiffs would be entitled to, even if they prevailed on each of their constitutional arguments.

■■■ However, the fact that plaintiffs have requested relief to which they are not entitled does not defeat their claim. A prayer for relief is not a part of the complaint. *Finch v. Miller, Credithrift*, 271 Or 271, 275, 531 P2d 893 (1975). Moreover, "a prayer for the wrong relief following a pleading that sets forth facts entitling the pleader to some relief does not operate to deny the proper relief[.]" *Wright v. Morton*, 125 Or 563, 569, 267 P 818 (1928). Although plaintiffs sought

improperly to enjoin enforcement of Measure 58 in its entirety, they also sought "other and further relief as the Court deems just and equitable." We, therefore, address plaintiffs' as-applied constitutional claims, because other relief, such as more limited injunctive relief, might be appropriate should plaintiffs prevail.

## STATE CONSTITUTIONAL ISSUES

We turn to plaintiffs' claims under the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court first addresses claims under state constitution before turning to federal claims). Plaintiffs argue that the provisions of Measure 58 that would permit their adopted children to discover plaintiffs' identities unconstitutionally impair the obligations of plaintiffs' adoption contracts in violation of Article I, section 21, of the Oregon Constitution. The trial court rejected plaintiffs' argument on the ground that Oregon laws before the enactment of Measure 58 did not provide the assurances of absolute confidentiality that plaintiffs now assert were a part of their adoption contracts.

Article I, section 21, of the Oregon Constitution, provides, in part, that "no law * * * impairing the obligation of contracts shall ever be passed." Plaintiffs assert that they were promised by staff of various private entities—such as hospitals and adoption agencies that facilitated the adoptions—that, under Oregon law, the identities of birth mothers who surrendered their children for adoption would be kept confidential. Plaintiffs assert that the state, through its agency the State Office for Services to Children and Families (SOSCF) (formerly Children's Services Division or CSD), was, in effect, a party to those adoption contracts, given its role in regulating adoptions and licensing adoption agencies. They further assert that the individuals, such as physicians and social service workers who made representations to them that their identities would be kept confidential, acted as agents of the state in doing so. Plaintiffs argue that the express promises of confidentiality that they received, coupled with Oregon statutes that, at the time of the adoptions, provided for the sealing of adoption records, including original birth certificates, were material terms of the contracts for

adoption into which they entered. They assert that the implementation of Measure 58 unconstitutionally impairs the obligations of those contracts in violation of Article I, section 21, of the Oregon Constitution.

In response, the state asserts that it was not party to any contract with plaintiffs for the adoption of their children and that, even if it were, no constitutional impairment of such contracts could be shown because confidentiality of birth mothers' identities was never guaranteed by statute. Thus, the state asserts, the change in the law does not substantially impair any contracts with plaintiffs.

Because the success of plaintiffs' claim depends on the existence of a statutory contract, our first step in analyzing their claims involves a review of the relevant statutes on which plaintiffs rely. As noted above, plaintiffs surrendered their children for adoption between the years 1960 and 1994, so our focus is on the pertinent statutory provisions in effect during that period. However, for historical perspective, we also review the history of adoption law in Oregon generally.

■ At common law, adoption was unknown. *Zockert v. Fanning*, 310 Or 514, 517, 800 P2d 773 (1990). Oregon's first adoption law was enacted in 1864 and had the same effect as modern adoption law of severing legal ties to the child's birth parents and declaring the child to be the child of the adoptive parents for most purposes. General Laws of Oregon 1843-1872, ch 13, §§ 67-68 (Deady and Lane 1874). The court granting the adoption could also grant a certificate of name change if requested. *Id.* § 73. All name changes, from adoption or otherwise, were reported to the secretary of state and published annually with the statutes of the following year. *Id.* § 74. Those laws made no provision for secrecy as to the identities of birth parents.[3]

The adoption laws remained essentially the same until 1921, when the annual publication of name changes ceased. The year 1939 marked the enactment of the first law

---

[3] Oregon does not appear to have had a statewide system of issuing official birth certificates until early in the 20th century. Not surprisingly, then, the original adoption laws made no provision for alteration, amendment, or sealing of birth certificates.

to provide any degree of anonymity to the participants of an adoption. At that time, the journal, index, and fee register recording adoption information was sealed but could be inspected pursuant to a court order. Or Laws 1939, ch 321. In 1941, the legislature for the first time provided for the creation of altered birth certificates for adoptees. That law further provided, however, that the original birth certificate could be opened, pursuant either to court order or on the request of an adopted person who had reached the age of majority. Or Laws 1941, ch 130, § 21. In 1957, the legislature eliminated the provision that permitted adult adoptees to obtain their original birth certificates but retained the provision allowing the birth certificates to be released on court order. Or Laws 1957, ch 193.

The next major alteration of adoption laws occurred in 1979. The legislature at that time provided for sealing all adoption records, rather than only the journal, index, and fee records as earlier provided. Or Laws 1979, ch 58, § 5. Again, the law provided for unsealing the records on order of a court. *Id.* Effective January 1, 1980, the legislature required, in all cases involving adoption of a minor, that a medical history of the minor's biological parents be provided to the adoptive parents at the time of the decree and to the adoptee, on request, after the adoptee reached the age of majority. Or Laws 1979, ch 493, § 2.

In 1983, the legislature created a voluntary adoption registry, whereby birth parents and adoptees, by mutual consent, could agree to exchange either nonidentifying or identifying information. That law also provided a mechanism for certain family members to contact or be contacted by adoptees after a birth mother's death and for adult adoptees and their adult adoptee biological siblings to contact each other, on their mutual consent. Also in 1983, as part of a major overhaul of the state's vital records laws, certain provisions were enacted relating to birth certificates. Or Laws 1983, ch 709. Under that law, although an original birth certificate would be sealed on creation of a new birth certificate for an adoptee, the adoptive parents, the adoptee, or the court could request that a new birth certificate *not* be created. Or Laws 1983, ch 709, § 11a(1)(a); § 11a(6). That law further provided that the sealed birth certificates could be subject to inspection either

on order of a court of competent jurisdiction or as provided by rule of the state registrar. *Id.* at § 11a(2).

■■■■ With that background, we turn to plaintiffs' assertion that a statutory contract exists between them and the state for confidentiality of their identities as revealed on the original birth certificates of their adopted children. The primary provision on which plaintiffs rely is the introductory section of the 1983 law establishing the voluntary adoption registry:

> "It is the policy of this state that adoption is based upon the legal termination of parental rights and responsibilities of birth parents and the creation of the legal relationship of parents and child between an adoptee and the adoptive parents. These legal and social premises underlying adoption must be maintained. The state recognizes that some adults who were adopted as children have a strong desire to obtain identifying information about their birth parents while other such adult adoptees have no such desire. The state further recognizes that some birth parents have a strong desire to obtain identifying information about their biological children who were adopted, while other birth parents have no such desire. The state fully recognizes the right to privacy and confidentiality of birth parents whose children were adopted, the adoptees, and the adoptive parents. The purpose of this Act is to:

> "(1) Set up a voluntary adoption registry where birth parents and adult adoptees may register their willingness to the release of identifying information to each other;

> "(2) Provide for the disclosure of identifying information to birth parents and their genetic offspring through a social worker employed by a licensed adoption agency, if a birth parent or parents and the adult adoptee are registered; and

> "(3) Provide for the transmission of nonidentifying health and social and genetic history of the adult adoptees, birth parents and other specified persons."

Article I, section 21, of the Oregon Constitution, precludes the legislature from passing laws—or the voters acting in their legislative capacity from passing initiatives—that "impair the obligations of contracts." That provision applies to contracts made by the state, as well as to contracts

entered into by private parties. *Eckles v. State of Oregon*, 306 Or 380, 390, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032 (1989). Consequently, it is possible for one legislature to "bind a succeeding legislature to a particular course of action." *Hughes v. State of Oregon*, 314 Or 1, 13, 838 P2d 1018 (1992). Plaintiffs assert that the legislation in place before the enactment of Measure 58 pertaining to confidentiality of birth records of adoptees formed contractual obligations and thereby bound succeeding lawmakers to the terms of confidentiality established by the earlier laws. In particular, plaintiffs rely on: the provisions of the 1957 enactment described above, as amended in 1979 and codified at ORS 7.211, that provides for the opening of adoption records only on order of a court; the law providing for the creation of altered birth certificates and the sealing of original birth certificates enacted in 1939, as amended in 1957 to prohibit disclosure of the original certificates to adult adoptees in the absence of a court order; and the policy statement contained in the voluntary registration legislation enacted in 1983 that "fully recognizes the right to privacy and confidentiality of birth parents whose children were adopted, the adoptees and the adoptive parents." Or Laws 1983, ch 672, § 1.

Framed by plaintiffs' arguments, the precise issues are, first, whether those statutory provisions created a statutory contract between the state and birth mothers who relinquished children for adoption; and, second, whether a guarantee of confidentiality of the birth mothers' identities is a material term of that contract. As to the first inquiry, we must determine whether the statutes in question "unambiguously express[ ] an intention to create a contract." *Hughes*, 314 Or at 17.

In addressing questions under Article I, section 21, courts look to "general principles of contract law." *Eckles v. State of Oregon*, 306 Or at 398. We recognize, however, the difficulties of characterizing an adoption in traditional contract terms. For example, it is undisputed that children may not be bought and sold in commercial contractual transactions. *See* ORS 163.537 (buying or selling of person under age of 18 is a Class B felony). Thus, to the extent that an agreement between one party to relinquish a child for adoption

and another party to adopt a child may be viewed as a contract, it is a contract with terms that are strictly prescribed by state law. Private adoption agreements that do not conform to state law generally are not enforceable, although courts will give effect to adoption agreements that are valid in the states in which they are made. *See, e.g., Schultz v. First Nat. Bk. of Portland et al*, 220 Or 350, 359, 348 P2d 22 (1959). Despite the difficulties in characterizing an adoption in terms of "general principles of contract law," we accept for present purposes that the mutual agreements required of birth and adoptive parents in completing adoptions, coupled with the pervasive state regulation and, indeed, the state's dictation of the terms of the agreements, create a species of agreement that may be cognizable for purposes of Article I, section 21. *See, e.g., In re Flora's Adoption*, 152 Or 155, 159, 52 P2d 178 (1935) (state is a party to adoption proceedings).

■■ The question remains whether there is a statutory contract and, if so, which terms are statutorily provided. In *FOPPO v. State of Oregon*, 144 Or App 535, 539-40, 928 P2d 335 (1996), we elaborated on the rule that a statutory contract will not be inferred in the absence of an unambiguous legislative expression of intent to create a contract:

> "Where the legislation 'contain[s] nothing indicative of a legislative commitment not to repeal or amend the statute in the future,' a statutory contract probably cannot be found. [*Eckles*, 306 Or] at 391. Because a statutory contract unambiguously must express that legislative commitment, resort to the legislative history to root out some latent legislative promise is inappropriate. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993) (courts may examine legislative history to discern legislative intent only when that intent is not clear from text and context of a statute). Legislative history can resolve ambiguity but cannot remove it. A statute is unambiguous where the text provides support for only one plausible interpretation. *See Heinzel v. Backstrom*, 310 Or 89, 96, 794 P2d 775 (1990) (contract is ambiguous if it supports conflicting interpretations); *see also Hughes*, 314 Or at 14 (general principles of contract law normally govern inquiry into whether statute creates contractual obligations for state)."

The Oregon Supreme Court found impairment of the obligations of contract under Article I, section 21, in both *Eckles* and *Hughes*. We believe that those cases are distinguishable from the present case in numerous ways.

In *Eckles*, the question presented was whether legislation that transferred funds from the Industrial Accident Fund (IAF) to the state's general fund and removed restrictions on the use of the IAF trust funds violated Article I, section 21. IAF funds were received from insureds by the State Accident Insurance Fund Corporation (SAIF), a public corporation that provides workers' compensation insurance of the same type provided by private insurers. Those funds had been designated as trust funds to be used exclusively for specific purposes established by the workers' compensation laws. 306 Or at 382.

In 1982, the legislature, facing a budget deficit, ordered IAF trust funds to be transferred to the general fund. *Id.* One of SAIF's insureds challenged the constitutionality of the transfer on the ground that it impaired his insurance contract with SAIF. The existence of a contract between SAIF and its insureds was not in question; the issue was whether the statute designating IAF trust funds for specific purposes within the workers' compensation system formed the basis for a contractual obligation of the state to SAIF's insureds. *Id.* at 390. The court concluded, based on the history of the IAF statute, that the limitation on the use of the funds was enacted "to induce skeptical employers to participate in a state insurance system that was, and still is, voluntary in the sense that private employers need not obtain workers' compensation insurance from SAIF." *Id.* at 393. The court concluded that the portion of the legislation that ordered the transfer of IAF trust funds to the general funds breached the insured's contracts and that the state would be liable for the breach, but that the portion of the legislation that removed the restriction on the use of the IAF trust funds, by contract, unconstitutionally impaired the state's *obligation* of contract, by retroactively altering the contract's terms. *Id.* at 399, 402.

In *Hughes*, state employees challenged legislation that subjected state public employees' retirement (PERS)

benefits to state income taxation, arguing that the new provisions violated Article I, section 21. 314 Or at 5. In *Hughes*, as in *Eckles*, the court had no trouble in determining that the plaintiffs did, in fact, have contracts with the state—the state conceded that PERS was a contract between the state and its employees. *Id.* at 11. The question, then, was whether the exemption of benefits from state taxation was intended to be a term of that contract. *Id.* at 21. The court held that the specific tax limitation was an integral part of the statutes that created the PERS contracts, in light of the unambiguous statutory language that the benefits "shall be" exempt from such taxes, which showed a legislative commitment not to repeal or amend the statute in the future. *Id.* at 24-26.

*Eckles* and *Hughes* differ from the present case in two definitive ways. First, a notable difference between the contract alleged to exist here and the contracts at issue in *Eckles* and *Hughes* is that the state, as a contracting party in *Eckles* and *Hughes*, was in a role that was essentially the same as the role of any contracting party in a commercial transaction between private parties. In *Eckles*, the state was acting as an insurer and contracting with employers in the same manner as a private insurer would, offering the other party an inducement (specific limitations on the use of IAF funds) to enter into the commercial transaction with it rather than with another. Similarly, in *Hughes*, the state was acting as an employer and, as might be the case with any private employer, was offering benefits that were attractive to employees, including tax-exempt retirement funds. Here, by contrast, the state's role in an adoption is not analogous to the role of any interested private party. The state's role is purely regulatory and involves the state's oversight of the adoption process for the general welfare of society, as well as for the specific welfare of the adoptee and the other parties to the adoption. *See generally* ORS 109.309 to ORS 109.342 (home studies required to establish that petitioners meet minimum standards for adoptive homes; limitations on advertising of children for adoption; consent requirements; grandparent visitation provisions; appointment of guardians; provisions for medical history). Unlike the state as insurer in *Eckles* or the state as employer in *Hughes*, the

state does not seek an advantage for itself by inducing individuals to agree to adoption on its terms. Rather, through its adoption laws, the state decrees that, for purposes of general welfare, adoption in Oregon is to occur only on certain terms. In sum, the role of the state in an adoption agreement fundamentally differs from the role of the state in an agreement with its own employees or its own insureds.

The second way that the present case differs from *Eckles* and *Hughes* is that the existence and scope of a statutory contract is much easier to discern in *Eckles* and *Hughes*. In *Eckles*, there was no dispute that the state, through SAIF, entered into specific written agreements with certain employers to provide certain insurance. Similarly, in *Hughes*, the state entered into contracts of employment with its employees. Insureds had the opportunity to contract with other insurers if they did not like the terms being offered by SAIF; employees could choose to work for other employers if they did not like the terms being offered by the state. Promises were made by the state as insurer and by the state as employer to induce the insureds and employees to enter into the contracts, and those promises constituted contractual obligations. Here, by contrast, the state does not directly contract with birth parents or adoptive parents. Those parties are free to enter into adoption agreements with each other, or not; however, if they choose to enter into such agreements, then those agreements must conform to the laws of the state. The statutory framework of adoption law, however, contains no unambiguous promises by the state that are similar to the statutory promises at issue in *Eckles* and *Hughes*.

The pre-Measure 58 statutory scheme governing adoption records and birth certificates simply does not contain any unambiguous expression of legislative intent to enter into a statutory contract with birth mothers to prevent the disclosure of their identities to their adopted children without their consent. As may be observed from the chronology described above, the laws governing confidentiality of adoption records have been amended regularly throughout this century to provide varying degrees of confidentiality at

various times. At no time in Oregon's history have the adoption laws prevented all dissemination of information concerning the identities of birth mothers. At no time in Oregon's history have the adoption laws required the consent of, or even notice to, a birth mother on the opening of adoption records or sealed birth certificates. Moreover, the laws do not demonstrate a legislative intent to elevate considerations of a birth mother's desire for confidentiality over the legitimate needs of other interested parties in obtaining information concerning the birth. *See, e.g.*, ORS 7.211; ORS 432.230 (placing no specific limits on the discretion of courts to order adoption records and birth certificates to be unsealed).

The statement in the preface to the adoption registry law that the "state fully recognizes the right to privacy and confidentiality of birth parents whose children were adopted, the adoptees and the adoptive parents" provides some support for plaintiffs' position that the 1983 Legislature recognized the importance of confidentiality to some birth parents. That statement, however, must be viewed in the context of the remainder of the preface and in the context of the adoption registry statutes and the rest of the statutory provisions concerning adoption and birth records.[4] The statement that we quoted earlier refers not only to birth parents but also to adoptive parents and adoptees. It thus demonstrates no intent to elevate the interests of birth parents over those of other interested parties to an adoption. The legislature noted in the same paragraph that "some birth parents have a strong desire to obtain identifying information about their biological children" and that "some adults who were adopted as children have a strong desire to obtain identifying information about their birth parents." Or Laws 1983, ch 672, § 1. Those statements, taken together, indicate a legislative intent to balance the interests of all concerned parties rather than to place the interests of one party over those of another. The content of the remaining provisions of the adoption registry statutes bears out that reading. Although most of the contacts to be facilitated by the adoption registry require the

---

[4] We note, moreover, that four of the plaintiffs placed their children for adoption before the 1983 enactment and that the 1983 provisions therefore could not serve as the basis for any statutory contracts between them and the state.

participation of the birth mother, that is not true in every case. It is possible, for example, for adult adoptees and their adult adoptee biological siblings to trace each other through use of the registry. *Id.* at §§ 7, 8, 11.[5] It is also possible for certain family members to obtain information when the birth mother is deceased. *Id.*

 The broader context of the adoption records and birth certificate statutes in place at the time of the 1983 enactment that explicitly recognized birth mothers' privacy and confidentiality rights make it clear that the legislature was not guaranteeing the confidentiality to which plaintiffs claim they are entitled. As noted above, all such records could be opened on court order. Moreover, the same 1983 Legislature provided that not all original birth certificates were to be sealed when a child was relinquished for adoption, and the birth mother had no say in whether the original birth certificate was sealed. Or Laws 1983, ch 709, § 11 (codified at ORS 432.230). Under ORS 432.230(1)(a), a new birth certificate is created on adoption and the original is sealed, unless the adoptive parents, the adoptee, or the court decreeing the adoption request that a new certificate not be created. That statute is unambiguous; when that provision is used by adoptive parents, adoptees, or a court, the birth mother's identity is not confidential. Plaintiffs suggest that "ORS 432.230(1)(a) applies *only* to adult and stepparent adoptions." In support of their position, they point to legislative history that mentions adult adoption. We reject plaintiffs' contention. Legislative history, even if it were definitive — and this legislative history is not — cannot create an ambiguity in a statute that is not ambiguous on its face. Nothing in the text of ORS 432.230(1)(a) limits its application to adult or stepparent adoptions. As a practical matter, it may well be that this section is used most often in those situations or in intrafamily adoption situations. Nonetheless, it is not limited to those applications and makes no provision for confidentiality of a birth mother's identity.

---

[5] Further provisions concerning tracing of adult siblings were enacted in 1993 and are codified at ORS 109.502 through ORS 109.504.

In short, nothing in the text or the context of the adoption statutes on which plaintiffs rely evinces a legislative intent to enter into a contract with birth mothers to guarantee them that their identities will not be revealed to their adopted children without their consent.

Plaintiffs also contend, however, that, even if the statutes do not provide the explicit guarantees of confidentiality to which they assert they are entitled, the promises made to them by the various religious, medical, and social service personnel employed by private entities are binding on the state. Plaintiffs assert that the individuals who made those promises, although not employed by the state, were acting as agents for the state when they represented that identifying information about birth mothers would remain confidential.

We fail to see how the fact that individuals working for private organizations offered opinions about what they believed the law provided could somehow transform them into agents of the state for purposes of creating binding state contractual obligations. Even if such representations were made by persons who *were* agents of the state, agents may not bind the state to any arrangement that contravenes the statutes. *See Tidewater Barge Lines, Inc. v. EQC*, 159 Or App 296, 304-05, 974 P2d 807, *rev allowed* 329 Or 287 (1999) (agent did not have authority to bind government to a specific time frame for seeking judicial review of a decision different from the time frame established by statute). In any event, plaintiffs' reliance on the representations of social service and medical personnel ultimately comes back to whether the statutes themselves create a binding contractual obligation not to open birth certificates for inspection by adoptees. If the statutes did not provide for that promise, then state agents were without authority to make any such promise. If the state agents were without authority to make such a promise, then it is a promise that cannot be enforced. *Harsh Investment Corp. v. State Housing Division*, 88 Or App 151, 744 P2d 588 (1987), *rev den* 305 Or 273 (1988) ("Those who deal with state officers must know the extent of their authority and cannot claim by estoppel what they could not receive by contract."). Those principles have particular force here,

where plaintiffs rely on those representations to "bind a succeeding legislature to a particular course of action." *Hughes*, 314 Or at 13. If the legislature itself has not bound succeeding legislatures to a particular course of action, then we know of no basis on which a solitary state agent, acting without statutory authority, may do so.

Accordingly, we conclude that the trial court correctly determined that Measure 58 does not impair obligations of contract in violation of Article I, section 21, of the Oregon Constitution.

██ ██ Plaintiffs next assert that Measure 58 unconstitutionally invades privacy and confidentiality rights guaranteed to them by Article I, sections 1 and 33, of the Oregon Constitution. Article I, section 1, provides:

> "We declare that all men, when they form a social compact are equal in right: that all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; and they have at all times a right to alter, reform, or abolish the government in such manner as they may think proper."

Article I, section 33, provides:

> "This enumeration of rights, and privileges shall not be construed to impair or deny others retained by the people."

Plaintiffs suggest that these provisions, read together, provide constitutional protections to "fundamental" or "natural rights," which they assert include a birth mother's right to conceal her identity from her adopted children. Plaintiffs assert that the Oregon Supreme Court recognized such a privacy right under Article I, section 1, and Article I, section 33, in *Humphers v. First Interstate Bank,* 298 Or 706, 696 P2d 527 (1985). We disagree.

*Humphers* did not present any constitutional question, and the court did not decide any issues concerning constitutional privacy rights in that case. *Humphers* concerned numerous tort claims and a contract claim against a physician who assisted an adoptee in discovering her birth mother's identity by falsely informing a hospital that he had lost his medical records and that he needed to obtain copies of

the records for medical reasons. 298 Or at 708. The court began by discussing contractual, malpractice, breach of confidence, and intentional infliction of emotional distress remedies that might be available to a plaintiff such as the birth mother, *id.* at 709-10, 717-18, but it focused more on wrongful breach of confidentiality and invasion of privacy in the form of "unauthorized intrusion upon plaintiff's seclusion, solitude, and private affairs." *Id.* at 709, 711-12. The court recognized that the plaintiff had a privacy interest in protecting her identity, noting the statutory protections of adoptee birth records then in place. *Id.* at 716. That privacy interest was cognizable in tort; however, it was not absolute. The court went on to note that it was not prepared to hold the adoptee liable for invasion of privacy for seeking out her birth mother. "Nor, we think, would anyone who knew the facts without an obligation of secrecy commit a tort simply by telling them to [the adoptee]." *Id.* at 716-17. The court further noted that, had the doctor's misrepresentations about his need for the medical records been true, the plaintiff's "interest in nondisclosure would have been just as much invaded" but that "the intrusive conduct would lack the wrongfulness required for liability." *Id.* at 716-17 n 13. Nothing in *Humphers*, however, suggests that the Oregon Constitution recognizes a privacy interest, much less guarantees a constitutional privacy interest that is coextensive with, or indeed greater than, privacy interests that may be protected by tort law.

In sum, neither Article I, section 1, nor Article I, section 33, lend any support to the idea that the framers of the Oregon Constitution intended to confer on birth mothers a constitutional right to conceal their identities from their children. Those provisions, taken separately or together, have never been construed as providing a general privacy right under the Oregon Constitution. As noted above, adoption was unknown at common law, and early adoption statutes made no provisions for protecting the identities of birth mothers. We conclude that Measure 58 does not violate Article I, section 1, or Article I, section 33, of the Oregon Constitution.

## FEDERAL CONSTITUTIONAL ISSUES

Article I, section 10, of the United States Constitution, provides that "[n]o State shall * * * pass any * * * Law

impairing the Obligation of Contracts." For the most part, the analysis above of the Oregon constitutional protection against impairment of the obligation of contracts is parallel to the federal analysis. *See Eckles*, 306 Or at 395-98 (discussing evolution of federal law). For the reasons already described, the Oregon legislation preceding Measure 58 did not create a contract with birth mothers to guarantee them that their identities would not be revealed to their adopted children without their consent.[6] The trial court correctly concluded that Measure 58 does not violate Article I, section 10, of the United States Constitution.

Plaintiffs also argue that application of Measure 58 to them would violate fundamental constitutional rights of privacy and confidentiality under the federal constitution. In *Griswold·v. Connecticut*, 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965), the Court recognized a "penumbral" privacy right, not specifically attached to any single constitutional provision, "surrounding the marriage relationship." *Id.* at 486. In that case, the Court struck down a state law that criminalized the use of contraceptive devices or medicines by married couples. *Id.* Such a law, the Court stated, has a "maximum destructive impact" upon the marriage relationship that lies "within the zone of privacy created by several fundamental constitutional guarantees." *Id.* at 485. In *Eisenstadt v. Baird*, 405 US 438, 92 S Ct 1029, 31 L Ed 2d 349 (1972), the Court extended that protection to unmarried people as well, under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, on the ground that no rational basis existed for treating married and unmarried people differently in regard to their ability to use contraceptives. *Id.* at 447-48. The Court stated:

---

[6] We note that, even if we were to conclude that plaintiffs had shown a substantial impairment of a contractual relationship, the analysis under Article I, section 10, of the United States Constitution, would further require us to determine "whether the state law creating the substantial impairment is justified by a significant and legitimate public purpose and whether the method used by the state to advance that public purpose constitutes an unnecessarily broad repudiation of its contractual obligation to private persons." *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 364, 918 P2d 765 (1996) (citing cases). That is a significant question in this case but one we have no occasion to resolve, given our holding that there is no statutory contract right to confidentiality of the birth records.

"If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 453 (emphasis in original; citations omitted).

Eventually, in *Roe v. Wade*, 410 US 113, 153, 93 S Ct 705, 35 L Ed 2d 147 (1973), the Court extended this penumbral privacy right affecting decisions on whether to bear children to encompass a woman's right to choose to abort a fetus in the earlier stages of pregnancy.[7]

 Plaintiffs assert that allowing their adopted children access to the birth certificates that would reveal the names of their birth mothers violates the constitutional privacy rights of birth mothers because it constitutes an unwanted governmental intrusion into their decisions concerning whether to bear or beget children. *Eisenstadt*, 405 US at 453. Plaintiffs assert that the decision to give birth to a child and surrender it for adoption should be protected to the same extent as a decision to have an abortion or to give birth to a child and raise the child.[8]

---

[7] The Court later clarified that the penumbral privacy right at issue in *Roe* and *Griswold* should be viewed as located within the Fourteenth Amendment's "concept of personal liberty and restrictions upon state action." *Whalen v. Roe*, 429 US 589, 97 S Ct 869, 51 L Ed 2d 64 (1977), citing *Roe*. In *Whalen*, the plaintiff challenged a state law that required doctors to provide information to the state concerning any prescriptions of controlled substances that were of the sort likely to be abused. The Court rejected an argument that the law invaded a constitutional privacy right, because the law had a legitimate purpose and there were safeguards against misuse of the information and because the possibility for disclosure of the information in question "existed under the prior law and is entirely unrelated to" the new law. *Id.* at 600. The Court held that the impact of the law was not "sufficient to constitute an invasion of any right or liberty protected by the Fourteenth Amendment." *Id.* at 603-04. *Whalen* does not support plaintiff's position in the present case. First, it does not hold that a fundamental right to privacy is implicated by state public records laws. Second, to the extent that it might suggest that any privacy rights could ever be implicated by such laws, it would also seem to suggest that the state's legitimate need for the records involved would outweigh any privacy right. *Id.*

[8] Plaintiffs also suggest that the statutes on which it relies for its obligation of contracts claims created a privacy right that should be deemed to be "fundamental" for purposes of federal constitutional analysis. We disagree. Statutes do not create fundamental rights. *See State v. Cookman*, 324 Or 19, 36, 920 P2d 1086 (1996) (statute of limitations did not create "fundamental right"); *Griest v. Phillips*, 322 Or 281, 300, 906 P2d 789 (1995) (tort claim limitation did not infringe on fundamental right because "the right to collect damages for wrongful death is a statutory right only").

■■ ■■ We are sympathetic to plaintiffs' arguments because it is clear that the decision to place a child for adoption is an intensely personal decision. However, we are unable to conclude that a law that permits adult adoptees access to vital records concerning their births has the same sort of constitutional infirmities as the laws that criminalized contraception and abortion that were struck down in *Griswold, Eisenstadt*, and *Roe*. A decision to prevent pregnancy, or to terminate pregnancy in an early stage, is a decision that may be made unilaterally by individuals seeking to prevent conception or by a woman who wishes to terminate a pregnancy. A decision to relinquish a child for adoption, however, is not a decision that may be made unilaterally by a birth mother or by any other party. It requires, at a minimum, a willing birth mother, a willing adoptive parent, and the active oversight and approval of the state. Given that reality, it cannot be said that a birth mother has a fundamental right to give birth to a child and then have someone else assume legal responsibility for that child. *See generally* ORS 109.010 (concerning duties owed by parent to child). Although adoption is an option that generally is available to women faced with the dilemma of an unwanted pregnancy, we conclude that it is not a fundamental right. Because a birth mother has no fundamental right to have her child adopted, she also can have no correlative fundamental right to have her child adopted under circumstances that guarantee that her identity will not be revealed to the child.

Adoption necessarily involves a child that already has been born, and a birth is, and historically has been, essentially a public event. In *Doe v. Sundquist*, 106 F3d 702, 705 (6th Cir), *cert den* 522 US 810 (1997), the Sixth Circuit Court of Appeals, in rejecting a similar challenge to a Tennessee law that permits adoptees access to birth records, noted:

"A birth is simultaneously an intimate occasion and a public event—the government has long kept records of when, where and by whom babies are born. Such records have myriad purposes, such as furthering the interest of children in knowing the circumstances of their birth. The Tennessee legislature has resolved a conflict between that interest and

the competing interest of some parents in concealing the circumstances of a birth."

Neither a birth nor an adoption may be carried out in the absolute cloak of secrecy that may surround a contraception or the early termination of a pregnancy. A birth is an event that requires the generation of an accurate vital record that preserves certain data, including the name of the birth mother. That the state has a legitimate interest in preserving such data is not disputed here. We recognize that a birth mother may well have a legitimate interest in keeping secret the circumstances of a birth that is followed by an adoption and also that an adoptee may have a legitimate interest in discovering the identity of his or her birth mother. Legitimate interests, however, do not necessarily equate with fundamental rights. The state may make policy choices to accommodate such competing interests, just as the state has done with the passage of Measure 58. We conclude that the state legitimately may choose to disseminate such data to the child whose birth is recorded on such a birth certificate without infringing on any fundamental right to privacy of the birth mother who does not desire contact with the child.

Stay issued by this court preventing Measure 58 from going into effect is lifted, effective immediately; judgment affirmed.